Charles L. KUEBLER a/k/a Charles L. Kueblur a/k/a Charles Kuebler a/k/a Charles Louie Kuebler a/k/a Charles Keubler a/k/a Charles Louis Kuebler

v.

STATE of Mississippi

NO. 2012–CT–01825–SCT

Supreme Court of Mississippi.

11/10/2016

DAVID PAUL VOISIN, EDWARD BLACKMON, JR., ATTORNEYS FOR APPELLANT

OFFICE OF THE ATTORNEY GENERAL, BY: MELANIE DOTSON THOMAS, JEFFREY A. KLINGFUSS, ATTORNEYS FOR APPELLEE

**ON WRIT OF CERTIORARI**

KING, JUSTICE, FOR THE COURT:

**PART ONE**

¶ 1. Finding harmless error, the Court of Appeals affirmed Charles "Louie" Kuebler's conviction of deliberate-design murder and sentence of life in the custody of the Mississippi Department of Corrections (MDOC). This Court now finds that the trial court committed reversible error by denying Kuebler the opportunity to present his theory of defense, in granting a flight instruction, and by prohibiting Kuebler from offering evidence to rebut the State's argument that his flight indicated consciousness of guilt. Accordingly, we reverse and remand for a new trial.

**FACTS AND PROCEDURAL HISTORY**

¶ 2. Tamra "Tammy" Stuckey was shot and killed on the couch in Kuebler's apartment in the early morning hours of June 30, 2010. Tamra had been staying at Kuebler's apartment on Morningside Drive in Jackson for three or four days prior and had shown an unreciprocated romantic interest in Kuebler during this time.

¶ 3. The Court of Appeals stated:

On the evening of June 29, 2010, at approximately 5:15 p.m., Kuebler, Tamra, Nate, and his friend Jennifer Olivier were "hanging out" at Kuebler's apartment. Nate and Jennifer left but returned at approximately 7:15 p.m. At around 8:00 p.m., they all went to Jennifer's apartment to watch television. At 10:30 p.m., the four individuals relocated to the pool area, where they joined Aaron Aruck and Kristen Schumacher, whom they met for the first time. Aaron and Kristen lived in a nearby house with two other roommates. During their time at the pool, Kristen heard Kuebler verbally berating Tamra, who became upset. ...

Around midnight, Nate and Jennifer returned to their apartment. Kristen testified that Kuebler continued talking to Aaron and her, but "anytime Tamra tried to say anything, [Kuebler] would silence her and call her stupid; tell her to get in the house." Because Tamra had

to be at work at 5:00 a.m. in the morning, she eventually left the pool and retired to Kuebler's apartment shortly after midnight, leaving Kuebler, Aaron, and Kristen at the pool. After Tamra left the pool area, Kuebler started propositioning Kristen for sex, which made her feel very uncomfortable. At some point Aaron realized Kristen wanted to leave the pool area because of Kuebler's behavior; so they returned to their apartment.

Around 12:15 a.m., Tamra walked to Jennifer's apartment to retrieve some clothes Jennifer had laundered for her. Approximately ten minutes later, Kuebler came to Jennifer's apartment to retrieve Tamra's purse.

At 1:18 a.m., Tamra called Jennifer and Nate, crying. She told them Kuebler was being "mean" and "ugly" to her. Jennifer offered for her to come spend the night, but Tamra refused, stating she would have to "walk past" Kuebler if she left, and that would "make matters worse." Jennifer offered to go over to Kuebler's apartment and bring Tamra to her apartment, but Nate said that would not be a good idea. Nate told Tamra to just "go l[ie] down and go to sleep." Tamra said she would.

At 1:35 a.m., Tamra texted her long-time friend and roommate of six months, Kirby Edgar, a single message: "Wake up ... I need [yo]u to save me." Kirby lived in Canton, Mississippi. Tamra had also called Kirby twice, minutes before the text, but Kirby was asleep and answered neither.

Shortly after 2:00 a.m., Aaron realized he had left his cell phone in Kuebler's apartment when he had gone there to use the restroom earlier in the evening. Aaron returned to Kuebler's apartment to retrieve his phone and found Kuebler rummaging around in his closet looking for something. Tamra appeared to be asleep on the living-room couch. Once Aaron got his phone, Kuebler "put his hand on [Aaron's] shoulder and sort of hurried [him] out of the [apartment]." Aaron returned to his place and began smoking a cigarette on the front porch. Approximately ten minutes later, Aaron heard Kuebler screaming "hysterically." Aaron ran back to Kuebler's apartment to find Tamra lying on the couch, shot in the forehead. When Aaron asked Kuebler what happened, Kuebler told him he and Tamra "were fooling around with each other and that she enjoyed him holding the gun to her head while they had sex."

Before Aaron arrived at Kuebler's apartment, apparently Kuebler ran to Jennifer and Nate's apartment, where he beat on their door and yelled, "Tammy got shot in the head. Call 911." Nate testified Kuebler was "acting pretty crazy ... screaming and yelling"; so when Nate went into Kuebler's apartment, he looked for the gun. After walking outside to call 911, Nate returned and found Kuebler's gun on the floor by the coffee table. Nate observed that Tamra appeared to be deceased. Kuebler, covered in Tamra's blood, was attempting to give her CPR. Kuebler explained to Nate that the gun had fallen on the ground and gone off. Jennifer testified that when she arrived at the scene Kuebler was screaming and crying, saying, "Tammy, wake up." He told Jennifer, "[S]omething happened. My pistol fell on the floor."

Aaron returned to his place to tell Kristen that Tamra had been shot. Kristen called 911. At 2:41 p.m., the Jackson Police Department (JPD) received the call reporting the shooting. Officer Derrick Archey was the first responder on the scene, but other JPD officers arrived shortly thereafter, including Officers

Keith Freeman, Sean Snow, Dewayne West, Carl Ellis, Mark Seals, and Crime Scene Investigator Eneke Smith. Tamra was pronounced dead at the scene. The officers found Tamra's body lying on the couch, with a gunshot wound to the head, with her feet "tucked" under the couch pillows.

The officers took statements from Kristen, Aaron, Nate, and Jennifer. However, when officers attempted to put Kuebler in the back seat of a patrol car in order to question him (as is the procedure and which was done to the other witnesses), Kuebler became belligerent. He shouted obscenities and racial slurs, as well as physically resisted the officers. He was also telling the officers to "get [Tamra] some help," but the ambulance was already on the scene and medics had pronounced Tamra dead. When Kuebler refused to get into the patrol car, or put his hands behind his back after wrestling with the officers, they forced him to the ground and put handcuffs on him while he kicked and screamed. Once inside the patrol car, Kuebler proceeded to kick out one of the windows, resulting in the police placing him in leg shackles.

Investigator Smith recovered a Smith and Wesson .380 caliber handgun from the crime scene, along with two live rounds in the magazine, and one live round and shell casing from the floor. The gun and bullets were processed for fingerprints, but none were found. At the JPD station, Kuebler's hands were swabbed and the materials sent to the Mississippi Crime Lab (MCL) for a gunshot-residue test. Gunpowder was found on the back of Kuebler's right hand and left palm. Also, particles indicative of gunpowder were found on his right and left palms, and the back of his right and left hands. While JPD did not perform a gunshot-residue test on Tamra, Dr.

Feng Li, the forensic pathologist, did. The test was sent to the MCL for processing; however, an analysis was not conducted on Tamra's kit because of the lab's policy not to perform analyses on victims "due to the fact that a victim of a gunshot wound" would always test positive. However, the State submitted Tamra's gunshot-residue kit to the MCL for analysis the first day of trial. On the third day of trial, the lab released the results of the test. Gunpowder was positively found on the back of Tamra's right hand and palm, and on the back of her left hand. Further, particles indicative of gunpowder were found on both of her hands.

In September 2010, Kuebler was indicted for deliberate-design murder under Mississippi Code Annotated section 97–3–19(1)(a) (Rev. 2014), with the charge enhanced for using a firearm during the commission of a murder, in violation of Mississippi Code Annotated section 97–37–37 (Rev. 2014).

*Kuebler v. State*, 2012–KA–01825–COA, 205 So.3d 623, 2015 WL 5202944 (Miss. Ct. App. Sept. 8, 2015), *reh'g denied* (Feb. 23, 2016).

¶ 4. Kuebler's theories of defense at trial were that Tamra had either committed suicide or had been attempting to commit suicide and the gun had accidently discharged while he was attempting to stop her. On the night Tamra was murdered, Nate told police officers that he thought the shooting had been an accident. However, at the time of trial, he testified "not so much."

¶ 5. Starks Hathcock, a forensic scientist for the MCL, testified that the weapon found at the crime scene was the handgun that had killed Tamra. Hathcock performed a "drop test" with the gun and determined that the gun could not have

been discharged without someone cocking the gun and pulling the trigger.

¶ 6. Dr. Li testified that Tamra's cause of death was homicide and that she was shot at an intermediate range of two and one-half to three feet away. Dr. Li testified that, because of the trajectory of the bullet, the gun could not have fallen to the floor and accidentally discharged. However, Dr. Li additionally testified that if Tamra had been lying on the couch threatening to shoot herself with the gun pointed at herself and Kuebler had approached her and attempted to stop her when the gun discharged, the autopsy results would be consistent with that theory. Dr. Li also testified that he could not rule out that Tamra had her hands on the gun at the time the trigger was pulled and that he could not rule out accident as a manner of death.

¶ 7. As to Kuebler's alleged flight from custody, the Court of Appeals stated:

The trial court also allowed the State to introduce evidence of Kuebler's flight from custody in July 2011, approximately ten months after he was released on bond. Dennis Grant, an offender service coordinator from the probation company in charge of monitoring Kuebler through a home-monitoring device, testified at trial. Grant explained that after Kuebler posted bond, he was placed on house arrest in October 2010, and was restricted from leaving Hinds County for any reason. On July 13, 2011, Kuebler called and left Grant a message stating he had some documents from a dental appointment for him that he needed to deliver to the probation company's office, and he would call back. However, Kuebler never contacted Grant again or delivered the documents. The next day, Grant received notification from the monitoring center that the Hinds County Sheriff was in possession of Kuebler's ankle-bracelet monitoring device, which had been found on a highway outside of the Hinds County jurisdiction. Grant then informed the court Kuebler had violated the conditions of his probation.

Also testifying as to Kuebler's flight was Louisiana Trooper John Dauzat, who was on patrol in the early morning hours of July 17, 2011, near Alexandria, Louisiana. He initiated a traffic stop on Kuebler, who was speeding. Trooper Dauzat twice asked Kuebler to exit the vehicle, but instead of complying, Kuebler hollered, "what's the problem officer?" When Trooper Dauzat approached, Kuebler fled in his vehicle, initiating a high-speed chase. Other law enforcement units joined in the pursuit. Kuebler later abandoned his vehicle and fled on foot, before being apprehended by law enforcement. Kuebler then lied and told Trooper Dauzat his name was "Reggie Adams" from Jackson, Mississippi. Continuing his investigation, Trooper Dauzat determined "Reggie's" true identity approximately fourteen hours later.

The jury returned a verdict finding Kuebler guilty of deliberate-design murder, and the trial court sentenced him to life in prison. In December 2011, Kuebler filed a motion for a judgment notwithstanding the verdict or, in the alternative, a new trial. After a hearing, the trial court denied the motion in October 2012. Kuebler timely appealed.

*Kuebler v. State*, 2012–KA–01825–COA, 205 So.3d 623, 2015 WL 5202944 (Miss. Ct. App. Sept. 8, 2015), *reh'g denied* (Feb. 23, 2016).

¶ 8. The Court of Appeals found error with the admission of evidence of Kuebler's flight and the related jury instruction but held that it was harmless error and affirmed Kuebler's conviction and sentence.

## DISCUSSION

[1] ¶ 9. Proposed jury instruction D–10 stated in relevant part:

The Court instructs you must find the Defendant, "not guilty" even if he committed acts which caused the death of Tamra Stuckey, and even if he had ill will or malice toward the deceased if you have a reasonable doubt about whether these acts, if any, were either:

1. the result of an accident or misfortune while the Defendant was doing a lawful act by lawful means, with usual and ordinary caution, and without unlawful intent, or

2. the result of an accident and misfortune, in the heat of passion, upon sudden and sufficient provocation . . . .

Since the burden is not on the Defendant to prove the existence of these conditions, you must find the Defendant "not guilty" if the evidence raises a reasonable doubt that death may have occurred under any one of the foregoing circumstances.

The trial court denied instruction D–10, finding that it lacked supporting evidence. In denying this instruction, Kuebler was not allowed to present his theory of defense to the jury. We find that refusing instruction D–10 was reversible error.

¶ 10. This Court previously has held that "in homicide cases, the trial court should instruct the jury about a defendant's theories of defense, justification, or excuse that are supported by the evidence, no matter how meager or unlikely." *Brown v. State*, 39 So.3d 890, 899 (Miss. 2010) (quoting *Evans v. State*, 797 So.2d 811, 815 (Miss. 2000)). Thus, precedent demands that even meager evidence warrants an instruction on the defendant's theory of defense.

¶ 11. The evidence in favor of the instruction was as follows:

- No fingerprints were found on the weapon, making it impossible to refute the possibility that Tammy had been holding the weapon.

- A MCL Report, which was not produced until the third day of trial, showed that particles of gunshot residue were positively identified on the back of Tammy's right hand, on her right palm, and on the back of her left hand.

- Detective Kendrick testified that it would have affected his investigation if during the investigation he had known that there was a finding of gunshot residue on both Kuebler's hands as well as Tammy's.

- The defense argued numerous times to the court that the defense's theory was that Tammy was attempting to commit suicide when Kuebler grabbed the gun and it went off.

- The State's expert, Dr. Feng Li, testified that he could not rule out accident as the manner of death and that it was a possibility that the gun was in Tammy's hands at the time it was fired.

- Nate Robertson testified that Kuebler had been screaming for somebody to help and had been giving Tammy CPR. Although he testified that he was not sure anymore, Robertson informed a police officer after the incident that he thought this had been an accident.

- Officer Archey testified that Kuebler was attempting to give Tammy CPR when he arrived at the scene and that Kuebler had asked Officer Archey to call a medic.

- Sergeant Freeman testified that Kuebler had been "quite upset" and had been yelling and screaming at members of law enforcement to get Tammy some help. Officer Snow testified

that Kuebler had been upset and yelled, "my girlfriend is in there dying and y'all out here effing with me." Officer Seals testified that Kuebler had been asking about Tammy and had asked why she was not being put in the ambulance.

- Aaron Aruck's statement to the police said that, right after the incident occurred, Kuebler had been screaming for help and had told Aruck that "he and Tammy had been fooling around and the gun had went off." Jennifer Olivier testified that Kuebler had been screaming and crying and asking for help, saying "Tammy wake up."

■ ¶ 12. In light of the evidence presented, Kuebler had an absolute right to have the jury consider his defense, and the trial court committed reversible error in denying the accident instruction. As this Court previously has emphasized, "[i]t is, of course, an absolute right of an accused to have every lawful defense he asserts, even though based upon meager evidence and highly unlikely, to be submitted as a factual issue to be determined by the jury under proper instruction of the court. This Court will never permit an accused to be denied this fundamental right." *Chinn v. State*, 958 So.2d 1223, 1225 (Miss. 2007) (quoting *O'Bryant v. State*, 530 So.2d 129, 133 (Miss. 1988)). While Kuebler did not testify at trial, a defendant should not be forced to testify in order to be able to present his defense theory to the jury. Nate testified at trial that, at the time of Tammy's death, Nate told a police officer that he thought it had been an accident.

The State's pathologist testified that he could not rule out accident as a manner of death. And Kuebler's behavior, according to the testimony of most parties present at the scene, indicated concern for Tammy instead of the demeanor of a man who had shot someone point blank while the person was sleeping. All of this evidence was presented to the jury.

¶ 13. Because the defendant's right to have his theory of the case presented to a jury is so fundamental, even minimal evidence warrants granting the defendant's proposed jury instruction. Taking into consideration all of the testimony and evidence presented, we find that enough evidence was presented to warrant an accidental jury instruction and that the trial court committed reversible error in denying instruction D–10. Therefore, we reverse Kuebler's conviction and sentence and remand for a new trial.

DICKINSON, PRESIDING JUSTICE, FOR THE COURT:

## PART TWO

### I. The circuit judge erred by granting a flight instruction.

■ ¶ 14. A flight instruction may be granted only where the defendant's flight remains unexplained and "where that circumstance [the flight] has considerable probative value."[1] Under our precedent, a defendant's flight has been explained if the trial judge simply is "aware of an explanation" for the flight, other than consciousness of guilt.[2]

---

1. *Liggins v. State*, 726 So.2d 180, 183 (Miss. 1998) (citing *Banks v. State*, 631 So.2d 748, 751 (Miss. 1994); *Pannell v. State*, 455 So.2d 785, 788 (Miss. 1984); *Tran v. State*, 681 So.2d 514, 519 (Miss. 1996); *Mack v. State*, 650 So.2d 1289, 1308 (Miss. 1994); *Brown v. State*, 690 So.2d 276, 294 (Miss. 1996)).

2. *Fuselier v. State*, 702 So.2d 388, 390 (Miss. 1997) (citing *Fuselier v. State*, 468 So.2d 45, 57 (Miss. 1985)).

¶ 15. In this case, Kuebler's attorney not only made the judge aware of an alternative explanation, but he also took the entirely unnecessary step of proffering evidence to the circuit judge to prove that explanation. What is more, Kuebler's flight was so remote in time and circumstance from the crime that any de minimus probative value to show consciousness of guilt certainly failed to rise to this Court's long-standing requirement of "considerable probative value." [3] In other words, neither requirement was met.

### A. The circuit judge was "aware of an explanation" for Kuebler's flight.

¶ 16. Before trial, Kuebler's attorney informed the trial judge that, while out of jail on bond and awaiting trial, Kuebler had been in an automobile accident, and that police officers had informed Kuebler that, because of the accident, he would be arrested. He further explained that Kuebler feared returning to the Hinds County jail because, following his initial arrest, he had been severely beaten while held in that jail. This explanation sufficed under our precedent to preclude a flight instruction.

¶ 17. In *Liggins v. State* this Court held: When determining whether a flight instruction is appropriate, we further have explained that two considerations are paramount: (1) only unexplained flight merits a flight instruction; and (2) flight instructions are to be given only in cases where that circumstance has considera-

ble probative value. A flight instruction is appropriate where flight is "highly probative" to the facts of the particular case. [4]

The *Liggins* Court went on to point out that a flight instruction may not be granted where "there is an independent reason for flight *known by the court.*" [5] Then, explaining why a flight instruction was inappropriate in *Fuselier v. State*, the *Liggins* Court stated:

Fuselier was obviously put in a no-win situation by either being required to explain his flight and the fact that he was a prison escapee or not explaining the flight and subjecting himself to a flight instruction. Here, *because the court was aware of an explanation* for Fuselier's flight, which was at that time inadmissible, we are of the opinion that the flight instruction should not have been granted. [6]

¶ 18. Thus, Kuebler's flight was not unexplained because the trial judge "was aware of an explanation" for the flight, Kuebler having provided that explanation to the court. Because the standard is simply what is known to the trial court, the representations of the attorney—an officer of the court—certainly were enough to preclude a flight instruction. While it is true that what the lawyers say is not evidence to the jury, it is indisputable that their representations to the trial court contribute to what the trial judge is aware of, which is all our law has ever required to defeat a flight instruction. [7] So, the trial

---

3. *Liggins,* 726 So.2d at 183 (citing *Banks,* 631 So.2d at 751; *Pannell,* 455 So.2d at 788; *Tran,* 681 So.2d at 519; *Mack,* 650 So.2d at 1308; *Brown,* 690 So.2d at 294).

4. *Liggins,* 726 So.2d at 183 (citing *Banks,* 631 So.2d at 751; *Pannell,* 455 So.2d at 788; *Tran,* 681 So.2d at 519; *Mack,* 650 So.2d at 1308; *Brown,* 690 So.2d at 294; *Fuselier,* 702 So.2d at 390).

5. *Liggins,* 726 So.2d at 183 (citing *Fuselier,* 702 So.2d at 390) (emphasis added).

6. *Liggins,* 726 So.2d at 183 (quoting *Fuselier,* 468 So.2d at 57) (emphasis added).

7. In *BB Buggies, Inc. v. Leon,* several defendants appealed a trial court's refusal to set aside a default judgment in a products-liability suit. *BB Buggies, Inc. v. Leon,* 150 So.3d

judge erred by requiring proof of the explanation.

¶ 19. Moreover, even were the trial judge to require that proof, Kuebler's counsel provided it. When Kuebler's counsel explained Kuebler's flight before trial, the circuit judge questioned the existence of the accident that served as the triggering event in Kuebler's explanation. The trial judge stated, "[t]here is nothing else to show the court that there was an accident in Mississippi . . . ." Kuebler's counsel responded that "[t]here was an insurance report filed and I believe there was an accident report . . . [w]e would like to be able to produce that, Your Honor." The trial judge responded, "[a]ll right."

¶ 20. Later, during the trial, Kuebler's counsel did exactly that. He produced the accident report, telling the trial judge, "Your Honor, we have an announcement to make too. We have that accident report that we will hand to the court for it [sic] review and had copies made." Thus, it is indisputable that the trial judge not only had been informed about the accident, but was furnished evidence of it through the accident report.

¶ 21. Also, Kuebler attempted to call a doctor to testify that Kuebler had been treated for the injuries he received from the beating in jail, but the trial judge refused to allow the doctor to testify. Kuebler's counsel made an appropriate proffer by explaining to the trial judge what the doctor's testimony would have been, had he been allowed to testify. Moreover, Kuebler provided a copy of the federal lawsuit he filed, alleging the beating in the Hinds County Jail. So, not only did the trial

judge err by requiring proof, he erred by finding that the proof had not been presented. This alone sufficed to preclude a flight instruction.

¶ 22. The dissent's puzzling attempt to distinguish *Fuselier* says that

the trial court obviously knew—given the circumstances (procedural and otherwise) attending that particular case—the defendant was a prison escapee at the time authorities came to arrest him, and thus knew the defendant had an independent sufficient reason to flee.

As we already have pointed out, our precedent never has prescribed any burden on the defendant to establish the alternative explanation for flight by some standard of proof. But even if it had, the dissent fails to inform us of exactly how the *Fuselier* trial judge "obviously knew" that the defendant was a prison escapee. The *Fuselier* opinion includes not a single clue as to how the trial judge learned that Fuselier was a prison escapee. For all the dissent knows, Fuselier's counsel disclosed it to the trial judge in exactly the same way as Kuebler's counsel did here. Again, the test has never been whether the defendant came forward in a mini-trial with proof that established the alternative reason by a preponderance of the evidence. As established by our clear precedent, the test is whether the trial judge was made aware of the alternative reason for the flight.

### B. Kuebler's flight did not have "considerable probative value."

¶ 23. With respect to *Fuselier*'s requirement that the circumstances of the flight have "considerable probative value," it is difficult to imagine a case in which the

90, 94–5 (Miss. 2014). To establish the colorable defense necessary to set aside the default judgment, the defendants' attorney read from a product manual but never put that manual in evidence. *Id.* at 102–03. On appeal, the plaintiffs argued that this Court should disregard that defense because "counsel's arguments are not evidence." *Id.* This Court rejected their argument, stating "[w]e will not relegate the representations of counsel, officers of the court, to pulling something 'out of thin air.' " *Id.*

circumstances of the flight would have less probative value. Kuebler's flight took place more than a year after his alleged crime and more than eight months after he had been released on bond. In other words, the trial judge's decision to grant a flight instruction rests on the logic that, with no knowledge the police were after him, and after eight months without an inclination to flee, it suddenly occurred to Kuebler that he was guilty and he should flee. The logical fallacy of this theory is apparent.

¶ 24. The dissent's discussion of the probative value of Kuebler's flight is even more puzzling, given the facts the dissent fails to recognize. Kuebler's original trial date was July 5, 2011, but a week before the trial was to begin, the trial court continued it to November 2011. When Kuebler fled in early July, his trial was not scheduled for another four months. So the dissent's attempt to establish that Kuebler's flight had high probative value because it took place right before his trial is completely unpersuasive.

¶ 25. The fact of the matter is that Kuebler provided an explanation for his flight that was well-known to the trial judge, so the trial judge was required to deny the State's request for a flight instruction. And Kuebler's flight lacked sufficient probative value to justify a flight instruction.

## II. The circuit judge erred by excluding evidence relevant to explain Kuebler's flight.

■ ¶ 26. During the trial, Kuebler's attorney sought and obtained subpoenas for documents and witnesses related to Kuebler's explanation for his flight. As explained above, Kuebler's attorney wanted to explain Kuebler's flight by showing that he fled to avoid returning to the jail where he had been beaten. To do so, he obtained

subpoenas for the doctor who treated the injuries he suffered in the jail and for video footage from the jail depicting the beating.

¶ 27. Later, after the State rested and the circuit judge denied Kuebler's motion for a directed verdict, the State objected to Kuebler's use of any of the information obtained through the subpoenas the circuit judge had issued. After a lengthy exchange, the circuit judge found that Kuebler's evidence intended to explain his flight lacked probative value and would not be admitted. At that point the defense rested without calling any witnesses.

¶ 28. Kuebler clearly indicated his intent to show that he fled the jurisdiction because he wanted to avoid returning to a jail where he had been beaten. To prove that explanation, Kuebler intended to present testimony from his treating physician documenting injuries suffered at the jail.

■ ¶ 29. The circuit judge excluded all of this evidence on the grounds that it was not relevant. The circuit judge's relevance ruling clearly was error. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the case." [8] The circuit judge allowed the State, over Kuebler's objection, to present evidence of his flight from Hinds County. The State used this evidence to argue that Kuebler fled because he knew he was guilty. Kuebler's guilt certainly was a fact of consequence in the case, and, once the State used flight to prove that fact, any evidence supporting Kuebler's alternative explanation for that flight had some "tendency to make [that] fact more or less probable."

## CONCLUSION

¶ 30. Because the circuit judge erred by denying Kuebler the opportunity to pres-

8. Miss. R. Evid. 401.

ent his theory of defense, granting a flight instruction, and prohibiting Kuebler from offering evidence to rebut the State's argument that his flight indicated consciousness of guilt, we reverse and remand for a new trial.

¶ 31. **REVERSED AND REMANDED.**

PART I: WALLER, C.J., DICKINSON, P.J., LAMAR AND COLEMAN, JJ., CONCUR. KITCHENS, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J., AND KING, J. BEAM, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, P.J. MAXWELL, J., NOT PARTICIPATING.

PART II: WALLER, C.J., LAMAR, KING AND COLEMAN, JJ., CONCUR. KITCHENS, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J., AND KING, J.

KITCHENS, JUSTICE, SPECIALLY CONCURRING:

¶ 32. I fully join the well-reasoned decision of my colleagues, Presiding Justice Dickinson and Justice King. I write solely for the purpose of renewing my objection to the continued use by the trial courts of this State of a jury instruction which impermissibly informs juries that guilt may be inferred from circumstantial evidence of flight. This practice, in effect, relieves the State of its burden of proving, beyond a reasonable doubt, every material element of the crime charged. In my view, its use is *per se* reversible error, and I continue to advocate its abolition. *See Drummer v. State*, 167 So.3d 1180, 1199 (Miss. 2015) (Kitchens, J., dissenting from part II).

DICKINSON, P.J., AND KING, J., JOIN THIS OPINION.

BEAM, JUSTICE, DISSENTING:

¶ 33. Respectfully, I dissent from the majority's decision to reverse and remand this case for a new trial. For the reasons articulated by the Court of Appeals, I find no error in the trial court's decision to deny jury instruction D–10 for lack of supporting evidence. I also find no error in the trial court's decision to grant the State's flight instruction. Because we are remanding for a new trial, I speak to the latter.

¶ 34. To be clear, the majority rightly finds no error in the trial court's decision to allow the State to present its flight evidence. This Court consistently has held that evidence of flight or escape is generally admissible as an exception to Mississippi Rule of Evidence 404(b) in order to show consciousness of guilt. *Mariche v. State*, 495 So.2d 507, 508 (Miss. 1986) (citing *Lee v. State*, 457 So.2d 920 (Miss. 1984); *Hill v. State*, 432 So.2d 427 (Miss. 1983)).

¶ 35. But the majority holds the trial court erred in granting a flight instruction, because: (1) Kuebler's attorney made the judge aware of an alternative explanation; and (2) Kuebler's flight was so remote in time from the crime that it failed to rise to this Court's longstanding requirement of "considerable probative value." This is erroneous.

¶ 36. Again, prior to trial, Kuebler's attorney claimed to the trial court that the reason Kuebler fled from Mississippi to Louisiana was because Kuebler was involved in an automobile accident and taken to the hospital. And responding authorities there told Kuebler he would be returned to the Hinds County Detention Center, where Kuebler allegedly had suffered a beating following his initial arrest the night of Tamra Stuckey's death.

¶ 37. A questionable claim, the trial court wanted something other than de-

fense counsel's narrative to substantiate it. Initially, all defense counsel sought to show in support of the claim were medical records from treatment Kuebler received after his arrest the night of Tamra's death. This, according to defense counsel, would demonstrate Kuebler's fear of returning to the detention center, thus establishing an independent reason for Kuebler's flight from Mississippi.

¶ 38. But, as the trial court concluded, this did not demonstrate the occurrence of an alleged accident and encounter with local law enforcement immediately prior to Kuebler's flight from Mississippi.

¶ 39. Remarkably, though, the majority instructs this does not matter because, whether substantiated or not, "[t]his explanation sufficed under our precedent to preclude a flight instruction." No, respectfully and emphatically, *it does not*.

¶ 40. For its holding, the majority relies on *Liggins v. State*, 726 So.2d 180 (Miss. 1998) and *Fuselier v. State*, 702 So.2d 388 (Miss. 1997). These cases, however, are distinguishable from the case before us.

¶ 41. In *Liggins*, the defendant testified at trial, and—according to the *Liggins* Court—provided "[p]lenty of evidence" that the defendant may have fled for reasons other than guilt of the crime at issue in that case. *Liggins*, 726 So.2d at 183. And, as the *Liggins* Court noted, so did the record in that case. *Id.* Accordingly, *Liggins* held the trial court erred in granting a flight instruction. *Id.*

¶ 42. Here, all we have in the record is what Kuebler's attorneys claimed occurred.

¶ 43. In *Fuselier*, the defendant did not testify, but the trial court obviously knew—given the circumstances (procedur-

al and otherwise) attending that particular case—the defendant was a prison escapee at the time authorities came to arrest him, and thus knew the defendant had an independent sufficient reason to flee. *Fuselier*, 702 So.2d at 390. The defendant's prison-escapee status was an uncontested fact that clearly would have qualified for judicial-notice recognition.[9]

¶ 44. The *Fuselier* Court also found this fact to be so prejudicial under our prior-bad-act evidence rule(s), it said the State should not have been allowed to introduce any evidence of the defendant's flight because it would inject this inadmissible prejudicial fact into the case. *Id.* at 390. Citing *Williams v. State*, 667 So.2d 15, 23 (Miss. 1996), *overruled on other grounds, Fuselier* iterated that: "Evidence of flight is inadmissible where there is an independent reason for flight known by the court which cannot be explained to the jury because of its prejudicial effect upon the defendant." *Fuselier*, 702 So.2d at 390.

¶ 45. That is not the case here. The claimed independent reason at issue has no prejudicial effect upon Kuebler whatsoever, because if true, it puts local law enforcement in a bad light. Under our adversary system, though, the State has every right to contest and challenge such a claim. And the trial court absolutely acted within in its discretion and duty in this instance to require it be substantiated.

¶ 46. Apart from finding this unnecessary, the majority finds the claim was substantiated because defense counsel produced an "accident report" for the trial court to review during the State's case in chief. But no other mention is made in the record of the "accident report" and it is not contained in the record before us on

9. The same can be said with the "product manual" analogy, the majority appears to make with *BB Buggies, Inc. v. Leon*, 150

So.3d 90 (Miss. 2014). The *existence* of a "product manual" was neither at issue nor a disputed fact in that case.

appeal. Thus, we have no way of knowing what this "accident report" actually is and whether or not the trial court abused its discretion in disregarding it.

¶ 47. As to the majority's finding that Kuebler's flight did not have "considerable probative value," the majority's analysis belies its conclusion. The majority says, "the trial judge's decision to grant a flight instruction rests on the logic that with no knowledge that the police were after him, and after eight months without an inclination to flee, it suddenly occurred to Kuebler that he was guilty and he should flee. The logical fallacy of this theory is apparent."

¶ 48. Indeed it is. What the majority fails to take into consideration is that when Kuebler removed his monitoring device and left Mississippi, was around the time Kuebler's trial initially was scheduled. But the trial court had granted Kuebler's request for a continuance approximately two weeks prior.

¶ 49. As the federal courts have recognized, flight immediately prior to trial can be just as probative as flight immediately after the commission of a crime. *See U.S. v. Hernandez–Miranda*, 601 F.2d 1104, 1107 (9th Cir. 1979) ("Flight immediately after the commission of a crime, or immediately prior to trial, both support an inference of consciousness of guilt."). Further, the Ninth Circuit explained that the immediacy (or remoteness) concern "generally only becomes important in those cases where the defendant does not know, or his knowledge is doubtful, about the charges and accusations made against him." *Id.* at 1107.

¶ 50. Here, there is no doubt Kuebler knew about the charges against him. And contrary to the majority's notion, if Kuebler's alleged accident-and-subsequent-encounter-with-law-enforcement claim is untrue or even doubted, then his decision to cut and remove his monitoring device and flee Mississippi becomes highly probative. *See United States v. Ollivierre*, 378 F.3d 412, 419 n.6 (4th Cir. 2004) (flight instruction appropriate where defendant absconded after release on bond), *rev'd on other grounds*, 543 U.S. 1112, 125 S.Ct. 1064, 160 L.Ed.2d 1050 (2005).

¶ 51. On this record, I find no error in the trial court's decision to grant a flight instruction. Accordingly, I dissent.

RANDOLPH, P.J., JOINS THIS OPINION.