# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2022-CA-00464-SCT

*JACKSON PUBLIC SCHOOL DISTRICT*

*v.*

*JACKSON FEDERATION OF TEACHERS AND
PSRPS*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/10/2022 |
| TRIAL JUDGE: | HON. JESS H. DICKINSON |
| TRIAL COURT ATTORNEYS: | GERALD LEE KUCIA, JR |
| | JOEL F. DILLARD |
| | LATOYA C. MERRITT |
| | MALLORY K. BLAND |
| | ERIKA DANIELLE ROBINSON |
| | LARRISSA CHANTRESE MOORE |
| | NICHOLAS FRANCIS MORISANI, SR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, |
| | FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | LATOYA C. MERRITT |
| | NICHOLAS FRANCIS MORISANI, SR. |
| | LARRISSA CHANTRESE MOORE |
| | MALLORY K. BLAND |
| ATTORNEY FOR APPELLEE: | JOEL F. DILLARD |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED AND RENDERED - 10/26/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE RANDOLPH, C.J., ISHEE AND GRIFFIS, JJ.**

**GRIFFIS, JUSTICE, FOR THE COURT:**

¶1.     Jackson Federation of Teachers (JFT) filed a complaint against Jackson Public School

District (JPS) and alleged that certain JPS policies violated the free speech rights of its

employees. The trial court (1) denied JPS's motion to dismiss for lack of standing, (2) denied

JPS's motion to dismiss for mootness, (3) found that JPS's three policies were in violation

of article 3, section 11, and article 3, section 13, of the Mississippi Constitution, and (4) issued a permanent injunction enjoining JPS from enforcing the policies. JPS timely appealed. Because JFT failed to establish standing, we reverse the trial court's decision and render judgment in favor of JPS.

## FACTS AND PROCEDURAL HISTORY

¶2. There is no substantial dispute of the facts. The dispute centers around the constitutionality of the policies under the Mississippi Constitution.

¶3. JFT is a labor union representing "member teachers, paraprofessionals, and school-related personnel in the Jackson Public School District." JFT claimed that JPS violated article 3, section 11, and article 3, section 13, of the Mississippi Constitution by restricting "the speech of its employees through a web of formal and informal policies, guidance documents, trainings and instructions" through its Confidential Information Policy (GACC), Staff Ethics Policy (GBA), and Social Networking Websites Policy (GBAA). JFT requested that the trial court find JPS's actions unlawful, order an injunction prohibiting all current and future enforcement of such actions, and require JPS to take affirmative actions to cure the violations. JFT sought financial damages in the form of nominal and punitive damages as well as costs and attorneys' fees.

¶4. JPS moved to dismiss and asserted that JFT lacked standing to bring the suit. After the second hearing, JPS asked the trial court to take judicial notice of certain policy changes by its board of trustees that had occurred after JFT filed suit. The parties agreed that the trial court should consider the record developed at the initial hearing and the two evidentiary

2

hearings and that the trial court would decide whether to dismiss the case or issue a declaratory judgment and permanent injunction.

¶5. The trial court considered three JPS policies: (1) Confidential Information Policy (GACC), (2) Staff Ethics Policy (GBA), and (3) Social Networking Websites Policy (GBAA). The applicable portions of those policies are as follows:

### GACC - CONFIDENTIAL INFORMATION

**All information** that pertains to the district, its employees, its students, its operations, and/or related matters constitutes proprietary information that belongs to JPS and is **strictly confidential**.

. . . .

No employee shall disclose, divulge or otherwise compromise any confidential information **except as authorized by the superintendent and/or board of trustees**. In addition, this policy strictly prohibits the unauthorized possession, disclosure, removal, distribution or other use of confidential school or district **information**, records, property, or funds.

. . . .

Any violation of **confidentiality** seriously injures the Jackson Public School District's reputation and can have adverse consequences on the men, women, and students who rely upon the protections afforded by this policy. Therefore, **any policy violation would result in termination**.

(Emphasis added.) Once defined, the term "confidential information" permeates JPS's policies and training.

### GBA - STAFF ETHICS

[E]mployees have a responsibility to the school system, to their fellow employees, parents and community and to the students that they serve to adhere to certain standards of behavior, performance and conduct. . . . [G]enerally speaking, the Jackson Public School District expects each of its employees to act in a professional and responsible manner at all times. In

3

addition, examples of some of the more obvious unacceptable behaviors that may subject an employee to disciplinary action, including **termination or revocation of certification are set forth below**. . . .

Employee [Standards of Conduct of Behavior] include the following:

. . . .

6) Directing **any criticism** of other staff members or of any department of the school system toward the improvement of the school system. Such constructive criticism is to be made **directly to the particular school administrator** who has the administrative responsibility for improving the situation and then to the superintendent, if necessary. The complaint policy, GAE, is cross-referenced.

. . . .

Prohibited Conduct:

Although not exhaustive, any of the following types of conduct by an employee is grounds for **discipline, up to and including immediate termination**:

. . . .

7) The district recognizes the obligation of all employees of the school district to be conscious of their professional responsibility not to divulge information presented by a student, parent, a colleague, or an agency **when that revelation is not in the best interest of the district**. The district recognizes that within a human services organization as complex as a school district, it is necessary to share information on a "need to know" basis. However, the sharing of information should only serve to assist, rectify, or resolve a situation and should never be downgraded to **idle gossip or negative commentary to the media, or others within the community**.

. . . .

36) Unauthorized disclosure or use of **confidential school information** . . . .

(Emphasis added.)

GBAA - SOCIAL NETWORKING WEBSITES

4

All employees, faculty and staff of this school district who participate in social networking websites **shall not post** any data, documents, photos or inappropriate information on any website or application **that might result in a disruption of classroom activity. This determination will be made by the Superintendent**. . . . [v]iolation of any of these policies may result in **disciplinary action, up to and including termination**.

USING SOCIAL MEDIA TO COMMUNICATE YOUR MESSAGE

[G]eneral guidelines for using social media, **personally or professionally**:

. . . .

Confidential Information

Online postings and conversations are not private. Do not share **confidential information** whether it is internal school discussions or specific information about students or other staff. What you post will be seen by others and will be online for a long time. It can be forwarded or shared in just a few clicks. Do not write about colleagues or students **without their expressed permission**.

(Emphasis added.)

¶6. The trial court granted JPS's motion to take judicial notice of the policy changes, but it denied JPS's motion to dismiss on the grounds of standing and mootness. JFT's petition for declaratory judgment and permanent injunction were granted in part and denied in part. The trial court found that there was no evidence of retaliation by JPS but that JPS's policies were unconstitutionally vague, overly broad, and restrained the speech of its employees. The trial court found that all of the GACC policy and portions of the GBA and GBAA policies were in violation of article 3, section 11, and article 3, section 13, of the Mississippi Constitution because they "unconstitutionally restrict[ed] the protected speech of JPS's employees" and were "a prior restraint on free speech[.]" The trial court further found that "by restricting JPS's employees' speech, the enjoined policies unconstitutionally restrict[ed]

5

JPS employees' right to petition their government." The trial court issued a permanent injunction regarding JPS's enforcement of the GACC policy in its entirety and sections of the GBA and GBAA policies. JPS was enjoined from instructing, training, or informing employees to follow these policies and disciplining, terminating, or otherwise penalizing employees for violations of these policies.

¶7.     JPS timely appealed. On appeal, JPS argued (1) JFT lacks standing to challenge JPS's employment policies, (2) JFT's challenge to the policies was moot at the time the trial court entered its declaratory judgment and permanent injunction, (3) JPS's policies are not unconstitutional, and (4) JFT did not meet its burden to obtain a permanent injunction.

**DISCUSSION**

*I.     Standing*

¶8.     Standing "is a question of law reviewed under a de novo standard." *DeSoto Times Today v. Memphis Publ'g Co.*, 991 So. 2d 609, 611 (Miss. 2008) (citing *Dep't of Hum. Servs. v. Gaddis*, 730 So. 2d 1116, 1117 (Miss. 1998)). "Standing is a jurisdictional issue, *City of Madison v. Bryan*, 763 So. 2d 162, 166 (Miss. 2000); *Frisby v. City of Gulfport (In re City of Biloxi)*, 113 So. 3d 565, 570 (Miss. 2013), and therefore addresses the fundamental question of the power of courts to act." *Butler v. Watson (In re Initiative Measure No. 65)*, 338 So. 3d 599, 605 (Miss. 2021). "[S]tanding must exist when litigation is commenced and must continue through all subsequent stages of litigation, or the case will become moot." *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Hotboxxx, LLC v. City of Gulfport*, 154 So. 3d 21, 28 (Miss. 2015)).

¶9.     In response to JPS's motion to dismiss for lack of standing, JFT asserts it has standing in its own right and through associate standing. We separately address each issue.

### A.     Standing In Its Own Right

¶10.    To establish standing in its own right, JFT must show it had a legal interest or "a right to judicial enforcement of a legal duty[.]" *Id.* (quoting *City of Picayune v. S. Reg'l Corp.*, 916 So. 2d 510, 526 (Miss. 2005)). We follow "the traditional articulation of 'adverse impact' to describe when a party can assert standing to bring a suit[.]" *Id.* (internal quotation marks omitted) (quoting *Reeves v. Gunn*, 307 So. 3d 436, 439 (Miss. 2020)).[1] We have described our general law on standing as follows:

> [D]ifferent standing requirements are accorded to different areas of the law, and an individual's legal interest or entitlement to assert a claim against a defendant must be grounded in some legal right recognized by law, whether by statute or by common law. Quite simply, the issue adjudicated in a standing case is whether the particular plaintiff had a right to judicial enforcement of a legal duty of the defendant or whether a party plaintiff in an action for legal relief can show in himself a present, existent actionable title or interest and demonstrate that this right was complete at the time of the institution of the action."Such is the general rule."

*Id.* (citations omitted) (quoting *City of Picayune*, 916 So. 2d at 526).

¶11.    JFT identifies itself as "a local labor union affiliated with the American Federation of Teachers." JFT represents "all *member* teachers, paraprofessionals, and school related personnel *in the Jackson Public School District*." (Emphasis added.) JFT asserts it can challenge rules that explicitly prohibit its protected speech and that single out professional

---

[1] "It is worth reiterating that the Court recently abandoned the 'colorable interest' standard for establishing standing." *In re Initiative Measure No. 65*, 338 So. 3d at 605 (quoting *Reeves*, 307 So. 3d at 438-39).

associations like JFT for unconstitutional limits on recruitment. The trial court agreed and found that JFT had a legal interest or entitlement to assert a claim against JPS. But by its own identification, JFT can only represent and assist its *current members*.

¶12. JFT offered five witnesses, none of whom were current JPS employees.[2] None of these witnesses stated that they had knowledge that any of the current JPS employees were current JFT members. While there was testimony regarding their dual loyalties during their employment and the then-simultaneous membership of others, there was no testimony to show that at the time this litigation was commenced, JFT had at least one member who was a current JPS employee.

¶13. JFT states that it can rely on circumstantial evidence to prove that it had concurrent members at the time of this lawsuit. JFT relies on the testimony of JPS witness, Tommy Nalls, who stated that when he was a teacher, joining a union "was kind of like a part of becoming a teacher in the building. You know, you get on board, you fill out your hiring paperwork, you join a professional organization." But Nalls's testimony discusses joining *a* union, not JFT specifically, and it discusses what was done in the past, while this Court requires that there be current membership throughout the case to establish standing. ***In re Initiative Measure No. 65***, 338 So. 3d at 605 (quoting ***Hotboxxx, LLC***, 154 So. 3d at 28).

¶14. JFT also relies on the testimony of its union organizer, Chris Radican, who testified

---

[2] Of JFT's five witnesses, Martha Taylor, Anthony Gunter, Shannon Anderson, and Akemie Stout had worked for JPS while a member of JFT *at some point* in time. No witness, however, worked for JPS at the time of this case. This means that at the time in question, they were not bound by JPS's employment policies. JFT's final witness, Chris Radican, never worked for JPS.

regarding his visits to the schools to sign up JPS employees. This testimony, however, fails to show that any JPS employees actually joined JFT, how long they maintained JFT membership, or that any JPS employees were JFT members at the time of litigation.

¶15. Finally, JFT asserts that JPS deputy superintendent Michael Cormack's ongoing correspondence with JFT president Akemie Stout over grievances shows current membership. But again, these issues appeared to take place before the start of litigation, and there was no specific time frame provided showing that it was done concurrently with this litigation as required. *Id.* (quoting ***Hotboxxx, LLC***, 154 So. 3d at 28).

¶16. This Court has not recognized circumstantial evidence to prove this element of standing.[3] Even if we did recognize such evidence, we find the evidence presented by JFT is insufficient.

¶17. JFT argues that it presented sufficient circumstantial evidence to show membership and that it cannot name individuals for fear of retaliation.[4] But there was no need for specific names. Instead, at any time throughout the litigation, JFT only needed one of its members to state that he or she knew of at least one member who currently worked for JPS. That did not happen.

¶18. JFT incorrectly relied on circumstantial evidence, and it failed to show a "present,

---

[3] There have been cases in other jurisdictions in which circumstantial evidence was used to prove the element of irreparable harm. *See **Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.***, 204 F.3d 149, 163 (4th Cir. 2000) (allowing the use of "circumstantial evidence such as proximity to polluting resources, predictions of discharge, and past pollution to prove both injury in fact and traceability"). But no such cases exist regarding the use of circumstantial evidence to prove standing.

[4] The trial court did not find sufficient evidence to justify a finding of retaliation.

existent actionable title or interest, and demonstrate that this right was complete at the time of the institution of th[is] action." *In re Initiative Measure No. 65*, 338 So. 3d at 605 (quoting *S. Reg'l Corp.*, 916 So. 2d at 526). As a result, we find JFT lacks standing in its own right.

### B.      Associate Standing

¶19.    As an association, JFT claims it may still have standing to bring suit on behalf of its members if it shows "(1) its members would otherwise have standing to sue in their own right, (2) the interest it seeks are germane to the organization's purpose, *and* (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Miss. Manufactured Hous. Ass'n v. Bd. of Aldermen of the City of Canton*, 870 So. 2d 1189, 1192 (Miss. 2004) (emphasis added) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977)).

¶20.    As previously discussed, JFT failed to show any current members employed by JPS. As a result, JFT failed to fulfill the first element of associate standing. Consequently, JFT lacks associate standing.

¶21.    The dissent asserts that witness testimony "provides ample evidence . . . that [JFT] . . . will be adversely impacted by [JPS]'s policy changes unconstitutionally limiting their employee's speech." Diss. Op. ¶ 35. But without current members employed by JPS, JFT will not be adversely impacted by JPS's policy changes.

¶22.    The dissent further asserts that direct evidence of membership is not required, and, in support, cites *Mississippi Manufactured Housing Association*. But in that case, the

10

Association had at least one member who owned property and managed a retail manufacturing housing center within the City of Canton. *Id.* at 1193. Here, there is simply no evidence that JFT "had a right to judicial enforcement of a legal duty of [JPS]" or that JFT showed a "present, existent actionable title or interest, and demonstrate[d] that this right was complete at the time of the institution of the action." *In re Initiative Measure No. 65*, 338 So. 3d at 605 (quoting *S. Reg'l Corp.*, 916 So. 2d at 526).

¶23. JFT established neither standing in its own right nor did it establish associate standing. As a result, the trial court erred by finding that JFT had standing to bring this action. We reverse the trial court's denial of JPS's motion to dismiss, and we render judgment in favor of JPS. *S. Reg'l Corp.*, 916 So. 2d at 513.[5]

¶24. **REVERSED AND RENDERED.**

**RANDOLPH, C.J., MAXWELL, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR. COLEMAN, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS AND KING, P.JJ.**

**COLEMAN, JUSTICE, DISSENTING:**

¶25. The majority holds the Jackson Federation of Teachers lacks standing because it did not present direct evidence that it had members who were employed by the school district. Accordingly, the majority asserts that the Federation failed to demonstrate it will be adversely impacted by the Jackson Public School District's policies. The holding is wrong for two reasons: (1) voluminous testimony in the record showed that the Federation is a legitimate organization, the interests of which are significantly affected by the District's policies; and

---

[5] Because the issue of standing is outcome determinative, we decline to address the remaining issues asserted by JPS on appeal.

11

(2) parties are not required to present evidence in the record to prove what is common knowledge. For these reasons, and because the Federation's First Amendment arguments are sound, I would affirm the judgment of the trial court.

## I. The Jackson Federation of Teachers had standing.

¶26. In *Reeves v. Gunn*, 307 So. 3d 436, 438 (¶ 10) (Miss. 2020), we clarified the requirements for standing in Mississippi. The amorphous term "colorable interest" was removed from our judicial parlance, and we retained the clearer "adverse impact" standard. *Id.* at 439 (¶ 11) (internal quotation marks omitted).

### a. Ample evidence in the record shows that the Federation is a legitimate organization that will be adversely impacted by changes to the District's policies.

¶27. All seven witnesses at trial—five for the plaintiff and two for the defense—gave testimony that reinforced the legitimacy of the Federation as an organization representing teachers employed by the District. The testimony clearly shows a close, interdependent relationship between the Federation and the teachers.

¶28. The District's first witness, its director of recruitment, testified that the District would "encourage [the new teachers] to meet with the representatives. And if they weren't a member of a professional organization such as the Federation, then, you know, they should be encouraging them to join." In describing his philosophy on teachers' participation in the Federation, he testified, "it's one of those things that it's a benefit to our teachers, and we strongly encourage that if they become a member—an educator within the district, state employee that they join a professional organization such as the Federation . . . ."

12

¶29. The following testimony also establishes that the Federation has current District employees as members:

Question:   As the director of recruiting, what is your philosophy in terms of your teachers' participation in the Jackson Federation of Teachers?

Answer:   It would really be the same philosophy that was placed upon me when I became a teacher in the district; that it's one of those things that it's a benefit to our teachers, and we strongly encourage that if they become a member.

He further testified that the District schools would host the Federation in their teachers' lounges, would make announcements that the Federation was on-site if employees wanted to talk to them, and would encourage the Federation to set up vendor tables at District events. His testimony illustrates the close and widespread cooperation between the two organizations, and it shows that the District considered the Federation a legitimate professional organization.

¶30. The District's second witness, its deputy superintendent, testified that he met with senior Federation staff as part of his District orientation, personally facilitated the Federation's access to schools during the period of COVID-19 restrictions, and gave his personal cell phone number to the president of the Federation. In describing how beneficial he considers his relationship with the Federation president, he testified: "There are things that she has line sight to that occur in schools." He additionally testified that the Federation president participated in the school reopening committee and has chimed in on school policies at public board meetings.

¶31. Anthony Gunter, a former part-time teacher, testified that he remained a member of

13

the Federation at the time of trial. Gunter had placed himself at risk of disciplinary action at the hands of the District when, in February 2019, he spoke to a news reporter about an outbreak of tuberculosis that occurred at Provine High School. Among other interactions with District personnel, his immediate supervisor informed him the day after he gave the interview that he was in violation of the district policy at issue here and would "be facing some form of consequences." Although he contradicted himself during cross-examination, Gunter testified that at the end of that day, Provine's principal, Dr. Kerry Gray, called Gunter into his office and terminated his employment. To be clear, the District did not employ Gunter at the time the complaint was filed or at the time of trial. Nevertheless, Gunter was a Federation member who testified that the District penalized him for speaking in violation of the school's policy.

¶32. The five witnesses for the Federation each testified in different ways describing the relationship between the two organizations. Most of the witnesses were former District employees who had been members of the Federation while employed by the District but who now work for the Federation. The president of the Federation testified about the longstanding relationship between the organizations and the expansive free flow of information between them. The treasurer of the Federation testified that part of her role involves collecting dues—dues presumably paid by members. A former Federation recruiter described the wide-ranging access the District granted to the Federation.

¶33. Representations that current District employees were members of the Federation abound in the filings. The Federation represented that their membership roll included current

District employees in other court communications that remain in the record. On the face of the Complaint, the Federation wrote that it "represents all member teachers, paraprofessionals, and school related personnel in the Jackson Public School District." In its Memorandum in Support of Plaintiff's Response in Opposition to Defendant's Motion to Dismiss, the Federation claimed to be "an organization whose membership and executive board are almost all [District] employees."

¶34. Even more compelling, in response to the court's question, the attorney for the Federation replied, "[The Federation] have current members. They're employees of JPS." The information given by the Federation's attorney—an officer of the court—can and should be considered here in the context of standing. "While it is true that what the lawyers say is not evidence to the jury, it is indisputable that their representations to the trial court contribute to what the trial judge is aware of . . . . So, the trial judge erred by requiring proof of the explanation." *Kuebler v. State*, 204 So. 3d 1220, 1227-28 (¶ 18) (Miss. 2016). The *Kuebler* Court relied on the Court's opinion in *BB Buggies, Inc. v. Leon*, 150 So. 3d 90 (Miss. 2014), and described the *Leon* Court's treatment of counsel's representations as follows:

> In *BB Buggies, Inc. v. Leon*, several defendants appealed a trial court's refusal to set aside a default judgment in a products-liability suit. *BB Buggies, Inc. v. Leon*, 150 So. 3d 90, 94–[9]5 (Miss. 2014). To establish the colorable defense necessary to set aside the default judgment, the defendants' attorney read from a product manual but never put that manual in evidence. *Id.* at 102–03. On appeal, the plaintiffs argued that this Court should disregard that defense because "counsel's arguments are not evidence." *Id.* This Court rejected their argument, stating "[w]e will not relegate the representations of counsel, officers of the court, to pulling something 'out of thin air.'" *Id.*

15

*Kuebler*, 204 So. 3d at 1227 (¶ 18) n.7.

¶35. The extent of interaction between the Federation and the District is demonstrated at length by the witnesses. Counsel for the Federation represented to the trial court that the Federation has current members employed by the District. Taken as a whole, the record provides ample evidence showing that the Federation is a legitimate organization that will be adversely impacted by the District's policy changes unconstitutionally limiting their employee's speech.

¶36. Additionally, the majority's holding contradicts a previous decision. In *Mississippi Manufactured Housing Ass'n v. Board of Aldermen of City of Canton*, 870 So. 2d 1189 (Miss. 2004), an organization representing the manufactured housing industry sued the city of Canton over a zoning decision. The city argued the association lacked standing, and the circuit court granted its motion to dismiss. On appeal, we reversed the circuit court's judgment and held that the association had standing despite its concession that "there is nothing in the record that indicates it has a member within the City of Canton." *Id.* at 1193 (¶ 16) n.3.

¶37. The majority claims that *Mississippi Manufactured Housing* should not control and is distinguishable from the instant case because "the Association had at least one member who owned property and managed a retail manufacturing housing center within the City of Canton." Maj. Op. ¶ 22 (citing *Miss. Manufactured Housing*, 870 So. 2d at 1193 (¶ 16). In fact, the full quote to which the majority refers reads: "MMHA asserts that one of its members owns property and manages a retail manufacturing housing center in the City of

16

Canton." ***Miss. Manufactured Housing***, 870 So. 2d at 1193 (¶ 16). In the current case, JFT also *asserts* that it has members who are current employees of the District. The knowledge that the Association in ***Mississippi Manufactured Housing*** had a member in Canton did not come from direct evidence in the record. "MMHA concedes *there is nothing in the record* that indicates it has a member within the City of Canton." ***Id.*** at 1193 (¶ 16) n.3 (emphasis added). Rather, the knowledge came to the Court either from pleadings in the trial court proceedings or from representations in the appellate briefs.

¶38. The majority holds that *solely* because there is no testimony containing the very specific magic words, "The Federation has members who teach in Jackson Public School," the Federation lacks standing. In ***Mississippi Manufactured Housing***, the Court held that the association did have standing, though there was no direct evidence in the record that it had members residing in Canton. ***Id.*** at 1194 (¶ 24). Although the ***Mississippi Manufactured Housing*** Court operated under the now-abandoned colorable-interest standard, the Court noted: "Members of [the association] will experience an adverse affect . . . ." ***Id.*** at 1194 (¶ 18). Direct evidence in the record of membership was not required in that case to prove standing, and it is not required in the case *sub judice*. The Court can make reasonable inferences to determine standing.

¶39. Evidence in the record shows that the Federation is a teachers' union located in Jackson that has been in operation for forty years. The inherent function of a union is to represent its members in negotiations with their employer. The reason there was no testimony presented saying "we have members who are currently employed by Jackson

17

Public Schools" is that all parties took it to be understood. All parties knew that the Federation represented current District employees because it is the essence of its existence. If it had no the District employee members, the Federation would have no reason to be.

¶40. When testimony established that the Federation was a teachers' union, no further testimony was required to explain the basic purpose and function of a union. The court understands the plain meaning of words and does not require evidence to be presented to explain every definition. "[T]here are certain facta probanda or propositions in a party's case, as to which he will not be required to offer evidence; these will be taken for true by the tribunal without the need of evidence, either because they are notoriously known or capable of unquestionable demonstration." *Eidt v. City of Natchez*, 421 So. 2d 1225, 1229 (Miss. 1982) (citations omitted) (quoting 9 Wigmore, Evidence § 2565 (Chadbourn rev. 1982)), *superseded by rule as stated in McIntosh v. Miss. Real Est. Comm'n*, 233 So. 3d 214 (Miss. 2017). By definition, a Jackson teachers' union represents Jackson teachers. A court may, and should, proceed through trial without requiring parties to present evidence on definitions of words in the common knowledge. "The court can take judicial notice of a thing in the common knowledge and use of the people throughout the country." *Brown v. Piper*, 91 U.S. 37, 38 (1875).

¶41. Here, the trial court knew the definition of and function of a teachers' union. The trial court knew that the Federation is a teachers' union. For purposes of our *de novo* review of the standing issue, there is more than enough evidence in the record to make the reasonable inference that members of the Federation were employed by the District. More evidence is

18

not required to be put into the record to prove that the Federation performs the normal duty of a teachers' union—representing current teachers.

¶42. Because all three elements of associational standing are met, *see **Belhaven Improvement Ass'n, Inc. v. City of Jackson***, 507 So. 2d 41, 47 (Miss. 1987) (citing ***Hunt v. Wash. State Apple Advert. Comm'n***, 432 U.S. 333 (1977)), I respectfully dissent on the issue of standing.

## II. The District's policies violate article 3, section 13, of the Mississippi Constitution by infringing on its employees' free speech rights.

¶43. The Mississippi Constitution states: "The freedom of speech and of the press shall be held sacred[.]" Miss. Const. art. 3, § 13. The Court has interpreted the section to mean that the Mississippi Constitution is "more protective of the individual's right to freedom of speech than [is] the First Amendment since our constitution makes it worthy of religious veneration." ***ABC Interstate Theatres, Inc. v. State***, 325 So. 2d 123, 127 (Miss. 1976).

¶44. The District has an official district policy defining confidential information. The definition is extremely broad, and a violation of the policy could result in termination. Once defined, the term "confidential information" is found throughout the District's policies. The staff ethics policy mandates that "Directing any criticism of other staff members or of any department of the school system toward the improvement of the improvement of the school system," if not made to the correct administrator, is grounds for termination. Additionally, the ethics policy forbids "divulg[ing] information . . . when that revelation is not in the best interest of the district." Violation of the rule also could lead to termination. The social networking websites policy makes posting "any data, documents, photos or inappropriate

19

information on any website or application that might result in a disruption of classroom activity," a fireable offense, subject to the discretion of the superintendent alone.

¶45. The trial court found the sprawling free speech limitations throughout these policies to be, at times, vague, overbroad, and unconstitutional. The requirement for employees to seek permission for speech from the superintendent was an unconstitutional prior restraint on employees' speech. The requirement not to share "negative commentary to the media," while allowing other commentary, was unconstitutional viewpoint discrimination. The trial court was correct on all counts. The policies enacted by the District violate the fundamental freedoms guaranteed to Mississippi citizens by our constitution. Freedom of speech is one of the bedrock principles underlying our democracy, and we guard it vigorously.

**III.    The case is not rendered moot by the District's later policy changes.**

¶46. After the trial, but before the trial court's decision, the District changed the definition of "confidential information" in its policies. The District argues that the change renders the case moot. The argument fails for several reasons.

¶47. We have held that "[a] case is moot so long as a judgment on the merits, if rendered, would be of no practical benefit to the plaintiff or detriment to the defendant." *Fails v. Jefferson Davis Cnty. Pub. Sch. Bd.*, 95 So. 3d 1223, 1225 (¶ 10) (Miss. 2012) (internal quotation marks omitted) (quoting *Gartrell v. Gartrell*, 936 So. 2d 915, 916 (¶ 8) (Miss. 2006)). If violations of the Federation's rights to free speech persist after the changes, then a judgment in its favor is of practical benefit.

¶48. The changes the District made to its confidential information policy failed to address

20

the free speech violations found by the trial court that arose from the District's staff ethics policy and its social networking websites policy.

¶49. The ethics policy still:

- prohibits all employees from "[d]irecting any criticism of other staff members or of any department of the school system toward the improvement of the school system," except to "the particular school administrator who has the administrative responsibility for improving the situation and then to the superintendent, if necessary"; and

- prohibits all employees from divulging information that "is not in the best interest of the district"; and

- requires employees to share information on a "need to know" basis; and

- bans "idle gossip or negative commentary to the media, or others within the community."

¶50. The social networking policy still prohibits "[a]ll employees, faculty and staff of this school district who participate in social networking websites" from posting "any data, documents, photos or inappropriate information on any website or application that might result in a disruption of classroom activity." Under the policy, the superintendent, alone, has the authority to monitor proposed postings and prohibit them, should the superintendent deem them "a disruption of classroom activity."

¶51. The post-trial changes made to the District's policy did not alleviate all of the constitutional violations that the trial court found, and there is nothing to guarantee that the District will not reinstate the previous violative definition at some point. The issue was not rendered moot by the District's change to the definition.

¶52.    In the case *sub judice*, the plaintiff had standing, the issue was not moot, and multiple

free speech violations occurred.  Accordingly, I would affirm the judgment of the trial court,

and I respectfully dissent.

**KITCHENS AND KING, P.JJ., JOIN THIS OPINION.**