GRIFFIS, J.,
for the Court.
¶ 1. This case arises from a complaint filed with the Mississippi Real Estate Commission (the “Commission”) by Cynthia Curley, the buyer of residential property in Jackson, Mississippi, alleging im *69 proper conduct by three real estate agents. Tanja E. Adams and Audrey Neely were the sales agents in the transaction, and Dell H. Palmer was the responsible broker who supervised their work. After conducting a hearing, the Commission found the agents guilty of misconduct and disciplined them by temporarily suspending their licenses and ordering them to complete additional continuing education courses. The Madison County Circuit Court affirmed the Commission’s decision.
¶ 2. Aggrieved by the decisions of the Commission and the circuit court, Adams, Neely, and Palmer appeal, alleging the following points of error: (1) whether the Commission’s findings were supported by substantial evidence, or whether such findings were arbitrary and capricious, and (2) whether the Commission relied upon violations not included in the complaint in rendering its decision. Finding no error, we affirm the judgment of the circuit court, which affirmed the decision of the Commission.
FACTS
¶ 3. Realty Executives, through its agent, Adams, had an oral listing for the sale of a residence located at 3603 North-view Drive in Jackson, Mississippi. The price advertised was $130,000. On October 3, 2005, Curley offered to purchase the property for $126,000. On the same day, Curley signed a dual agency confirmation form, indicating her consent to allow Adams to act as the agent for both Curley and the seller — identified on the form as Big Z Properties, LLC. Eight days later, John Zehr, acting as manager for Big Z, signed a separate dual agency confirmation form. This form was never signed or acknowledged by Curley. The dual agency confirmation form executed by Curley at the time she made the offer was not signed by Zehr until December 8, 2005, the day the transaction closed, further confusing the confirmation of a dual agency. Zehr also completed a “Working with a Real Estate Broker” form on the same day. However, the document did not identify that he was acting as the representative for Big Z. Instead, the document appeared to be signed in Zehr’s individual capacity.
¶ 4. A property condition disclosure statement form was allegedly signed and dated by Zehr on October 12, 2005. Neely, another agent for Realty Executives, alleged that she gave this form to Curley prior to closing. However, the document was not signed by Curley, nor was it submitted to the Commission during its investigation. In fact, it did not appear in the Appellants’ files with the other documents relating to the subject transaction.
¶ 5. On November 22, 2005, a contract of sale was accepted. The contract identified the seller as John Zehr, and Zehr signed the contract in that capacity. The contract required the buyer to provide a down payment of 20% of the purchase price. According to Curley, she had told Adams at the time she executed the offer that she only had $100 and that she did not have the financial means to make a down payment of 20% of the purchase price. However, Curley claimed that Adams told her she did not have to worry about it. At the hearing, Adams denied making such a statement.
¶ 6. With Curley having insufficient funds of her own, the 20% down payment was accomplished in the following manner. Curley testified that prior to the closing, the lender required confirmation of her ability to pay a 20% down payment. This was accomplished when Maranatha Services, Inc., a charitable organization, deposited $25,200 into Curley’s credit union account where it was held for six days. The deposit gave the lender the opportu *70 nity to verify that the buyer had the financial capacity to pay the $25,200 down payment. After the lender had verified Curley’s finances, the money was drafted out of the account.
¶ 7. The closing took place on December 8, 2005. The HUD-1 closing statement showed the sales price to be $126,000, and the statement reflected the principal amount of the new loan to be $100,800. Curley allegedly made a cash payment in the amount of $27,442.79 at the closing, which represented the down payment and closing costs. However, there was some dispute as to whether a check in that amount was actually brought to the closing. The closing statement reflected that this amount represented the cash paid by Curley. The fact that Curley received the proceeds for the down payment from the seller was not reflected in the closing statement. It merely revealed the financing to be a conventional uninsured loan, for which Curley personally provided a 20% down payment.
¶ 8. Zehr admitted that he gave Marana-tha the money that it provided to Curley. The record before this Court contains a copy of a check from Big Z in the amount of $27,442.79 payable to Regions Bank that listed Maranatha on the memo line. Another copy of a Big Z check in the amount of $2,500 was payable to Maranatha. Together, the checks totaled the $29,942.79 that was listed on an invoice from Marana-tha and sent to Big Z.
¶ 9. A few months after the closing, Cur-ley decided to sell the house and contacted Realty Executives for assistance. Curley claimed that she could no longer afford the mortgage payments.[1] Curley testified that before calling Realty Executives, she consulted another realtor with whom she was familiar. After examining the closing documents, that realtor told Curley that some of her paperwork was missing. Subsequently, Curley was contacted by the Commission regarding the discrepancies,[2] and a complaint was filed against the Appellants.
¶ 10. A hearing was held before the Commission on January 16, 2007. After hearing the evidence, the Commission found that Palmer, Adams, and Neely had violated the Real Estate Brokers License Act of 1954, specifically Mississippi Code Annotated section 73-35-21(l)(m) (Rev. 2008); Mississippi Code Annotated section 89-1-521(£) (Rev.1999); and Rule IV. E.3(c)(3) of the Mississippi Real Estate Commission’s Rules and Regulations. Specifically, the Commission found the Appellants guilty of the following: (1) failing to provide a property condition disclosure statement as required by law, (2) failing to have a dual agency confirmation form properly executed by the seller, and (3) having certain irregularities in the contract of sale and closing statement regarding down payment assistance provided by a nonparty charity to the buyer. Additionally, the Commission found that Palmer, as the responsible broker, was the ultimate licensee that the Commission relied on to supervise the agents in order to avoid these types of violations. According to the Commission, her failure to properly supervise Adams and Neely made her liable for their actions.
¶ 11. As discipline, the Commission suspended each of the Appellants and ordered *71 them to complete additional continuing education courses. The Commission required each of them to complete eight additional hours, four in the subject of agency and four in the subject of license law. Palmer’s and Adams’s suspensions were for ninety days, with Palmer’s suspension held in abeyance. Neely’s suspension was for thirty days. Palmer, Adams, and Neely filed an appeal with the Circuit Court of Madison County, which affirmed the decision of the Commission. They now appeal to this Court.
STANDARD OF REVIEW
¶ 12. This Court’s general standard of review is limited to determining whether or not the Commission’s action was (1) supported by credible evidence, (2) arbitrary or capricious, (3) beyond the power of the administrative agency to make, or (4) violated some statutory or constitutional right of the complaining party. McFadden v. Miss. State Bd. of Med. Licensure, 735 So.2d 145, 151(¶20) (Miss.1999) (citing Miss. State Bd. of Nursing v. Wilson, 624 So.2d 485, 489 (Miss.1993)). The supreme court has held that: “In attempting to determine the sufficiency and applicability of MREC’s rules ... it is proper to accord deference to the agency’s construction of its own rules and regulations.” Miss. Real Estate Comm’n v. Geico Fin. Servs., Inc., 602 So.2d 1155, 1156 (Miss.1992) (citing Melody Manor Convalescent Ctr. v. Miss. State Dep’t of Health, 546 So.2d 972, 974 (Miss.1989)) (“Great deference is accorded to an administrative agency’s construction of its own rules and regulations and the statutes under which it operates.”).
¶ 13. Because a professional license is at stake in this case, the Commission had the burden of proving its case against the respondents by clear and convincing evidence. McFadden, 735 So.2d at 152(1124); see also Miss. State Bd. of Psychological Exam’rs v. Hosford, 508 So.2d 1049, 1054 (Miss.1987); Hogan v. Miss. Bd. of Nursing, 457 So.2d 931, 934 (Miss.1984). “In order to take or suspend the license of a real estate broker under a charge of ... improper dealings, the proof need not be beyond a reasonable doubt, ... but the testimony must clearly establish the guilt of the respondent.” Miss. Real Estate Comm’n v. Anding, 732 So.2d 192, 197(¶ 13) (Miss.1999) (quoting Miss. Real Estate Comm’n v. Ryan, 248 So.2d 790, 793 (Miss.1971)); see also Miss. Real Estate Comm’n v. White, 586 So.2d 805, 808 (Miss.1991); Harris v. Miss. Real Estate Comm’n, 500 So.2d 958, 962 (Miss.1986). “Proof of surmise, conjecture, speculation or suspicion is not sufficient.” Anding, 732 So.2d at 197(¶ 13) (quoting Ryan, 248 So.2d at 793).
ANALYSIS

Whether the Commission’s findings were supported by substantial evidence.

A. The Dual Agency Agreement

¶ 14. The Appellants make two arguments concerning their roles as dual agents for both Big Z and Curley. First, they argue that Big Z, represented in the transaction by Zehr, was a limited liability company (LLC); therefore, a dual agency disclosure was not required pursuant to Rule IV.E.4 of the Rules and Regulations of the Mississippi Real Estate Commission. Alternatively, the Appellants point out that both Zehr and Curley were fully aware that the Appellants were acting as dual agents, as evidenced by the testimony of both parties and by the dual agency disclosures signed by both parties.
¶ 15. The Commission held that the Appellants violated Rule IV.E.3(c)(3) of the Commission’s Rules and Regulations which states:
*72 The Broker must confirm that the buyer(s) understands and consents to the consensual dual agency relationship pri- or to the signing of an offer to purchase. The buyer shall give his/her consent by signing the MREC Dual Agency Confirmation Form which shall be attached to the offer to purchase. The Broker must confirm that the seller(s) also understands and consents to the consensual dual agency relationship prior to presenting the offer to purchase. The seller shall give his/her consent by signing the MREC Dual Agency Confirmation Form attached to the buyer’s offer. The form shall remain attached to the offer to purchase regardless of the outcome of the offer to purchase.
The Appellants contend that this requirement does not apply because the transaction involved an LLC — one of the exceptions to Rule IV.E.3(c)(3) found in Rule IV.E.4.
¶ 16. However, the Commission found that the transaction did not fall within the LLC exception because it was unclear whether the seller was selling the property as an individual or as an LLC. The Commission found that:
the seller signed as an individual (not as a limited liability company) the Working With a Real Estate Broker form dated October 3, 2005, the Contract for Sale and Purchase of Property dated November 22, 2005, the Contract Addendum dated November 22, 2005, and another Dual Agency Confirmation form dated July 27, 2005, on this property.
Because this issue was unclear, the Commission found that the Appellants were indeed required to conform to the requirements of Rule IV.E.3(c)(3), which they did not.
¶ 17. There is substantial evidence of the confusion created by forms signed by the seller as an individual, not as an LLC. This evidence is listed in the Commission’s findings of fact and should not be disturbed by this Court. To find that Curley was put on notice that she was purchasing the property from an LLC would require this Court to totally disregard the Commission’s finding that by signing numerous other documents as an individual, the seller created the confusion. Such a finding would be especially disconcerting in light of the fact that the transaction involved a poor, inexperienced buyer. Accordingly, we find no merit to this issue.

B. The Property Condition Disclosure Statement

¶ 18. Next, the Appellants argue that they substantially complied with Mississippi Code Annotated section 89-1-521(1), which required them to deliver a property disclosure statement to Curley, the buyer. Although the Commission found no property disclosure statement in the file for the transaction, the Appellants presented such a statement at the hearing. The statement was not signed by Curley, but Adams testified that Neely believed that she had delivered a property disclosure statement to Curley. Also, Curley did not deny having received a copy of the statement. Accordingly, the Appellants argue that they complied with section 89-1-521(1) and that Curley was properly put on notice of the property disclosures; therefore, they argue that the Commission erred in finding them guilty of violating the statute.
¶ 19. In response, the Commission points out that its investigation revealed that a disclosure statement was not kept in the Appellants’ file for the transaction. The Commission also notes that the Appellants could not explain the absence of any such form from the file. In conclusion, the Commission argues that the fact that the Appellants did not maintain the statement as required served as substantial evidence *73 of their failure to comply with section 89-1-521(1). Additionally, the Commission notes that the property disclosure statement that the Appellants introduced into the record was not signed by Curley.
¶ 20. We are not persuaded by the Appellants’ arguments. The Appellants could not explain to the Commission why them files had not been maintained as required by the Commission’s regulations. Further, there was no evidence that the statement was delivered to the buyer as required by section 89-1-521(1). To reverse in this instance would be the equivalent of merely reweighing the evidence presented to the Commission. “This Court generally will not reweigh facts or substitute its [judgment] for that of the administrative agency.” Anding, 732 So.2d at 198(¶ 18) (citing Miss. Comm’n on Envtl. Quality v. Chickasaw County Bd. of Supervisors, 621 So.2d 1211, 1216 (Miss.1993)). Consequently, our standard of review prohibits such a course of action, particularly where the Commission determined that “[t]he testimony did not confirm the Disclosure Statement was delivered to the buyer as required by law.” Accordingly, we must conclude that this issue lacks merit.

C. Down Payment Assistance

¶21. Finally, the Commission held that the Appellants violated section 73-35-21(l)(m) which prohibits: “Any act or conduct ... which constitutes or demonstrates ... improper dealing.” The Commission found the transaction to be improper because the details of the transaction were not accurately reflected in the contract of sale or on the closing statement — details of which the Appellants were aware. The Commission’s order makes the following finding of fact:
In this case a 20% down payment was provided by a non-profit corporation and then immediately repaid to the non-profit corporation. This payment was not reflected on the HUD-1. Thus, the seller in truth sold the property which had a contract price of $126,000.00 for approximately $100,000.00. An investor in the secondary market would not be aware of the details of the transaction and in particular since it would not be alerted that the down payment by the buyer had actually not originated from her funds. The Administrator testified that in a transaction such as this, when a high[-]risk borrower does not invest a substantial amount of equity, the probability of default increases considerably. Further, the Administrator testified the actual value of the sale here was substantially below the $126,000.00 contract sales price because the seller paid $27,442.79 on behalf of the buyer.
¶22. The Appellants note that neither party alleged that the down payment assistance was illegal. However, that is not the issue. The issue here is whether this transaction demonstrated “improper dealing” on the part of the Appellants. The Commission concluded that it did, and that conclusion is supported by substantial evidence. This was a high-risk loan characterized as a low-risk loan by the actions of the seller, all unbeknownst to HUD and the lender.
¶ 23. This case is illustrative of some of the reasons this country is presently in a financial and mortgage crisis. The facts presently before us demonstrate the truth of the old maxim, “if it sounds too good to be true, it probably is.”
¶ 24. A Realty Executives realtor sign was posted in the yard even though Realty Executives could produce no written listing agreement with Zehr, the owner. Neely showed the house to Curley. Adams and Neely are Palmer’s sister and niece, respectively. Based on the record, the buyer, Curley, a health-care technician *74 at the Veteran’s Affairs Center in Jackson, was not a good credit risk. She was also unaware of the intricacies involved in a residential real estate transaction.
¶25. Initially, Curley qualified for an 85% loan and was interested in Zehr’s property. Adams testified she contacted Zehr to see if he was interested in an 85% buyer. After Curley agreed to purchase the house for $126,000, People’s Choice Bank discovered that Zehr had not exclusively listed the property to Realty Executives. Accordingly, People’s Choice Bank increased the down payment requirement to 20%. A 20% down payment on a $126,000 home would have required Curley to produce over $25,000 of her own funds. According to Curley, when she told Adams, the realtor, that she had only $100 available for a down payment, Adams responded that Curley’s financial situation would be no problem.
¶ 26. Adams contacted Zehr to inform him that Curley would only qualify for an 80% loan. Adams also asked Zehr if “we still had a deal” with only 80% financing. Zehr approved. It is curious why Zehr, the seller, had any interest whatsoever in the type or percentage of financing Curley intended to use. It is also unusual that a realtor would expect a seller to have any more or less desire to move forward on a transaction based on the level of financing the buyer needed. It would only appear relevant if the realtor knew the seller intended to pay the buyer’s down payment.
¶ 27. Curley did not have to produce a down payment. Zehr, the seller, provided that down payment through a network of legal entities. Curley — who had $17 in her account prior to the down payment deposit — testified she did not know how the down payment of over $26,000 came to be deposited into her credit union account or who deposited it. The evidence indicates that a man named Damien from Windsor Financial, LLC[3] walked Curley to the credit union with a check to deposit in her account and instructed her not to touch it during the six days it remained in her account. After People’s Choice Bank verified that Curley had sufficient funds in her account to make the 20% down payment, the $26,000 was mysteriously drafted out of Curley’s account. This is certainly not an irrevocable gift.
¶ 28. Adams coordinated closely with David in making sure that Curley would qualify for the loan. When asked: “what do you know about Ms. Curley going out and getting down payment assistance,” Adams responded as follows:
Well, I knew that she had that as an option all along for part of her loan situation, her down payment. And we were pleased that she was going to own 20 percent of the property instead of owing [a] 20 percent second mortgage which was the other option. And then that would set — you know, we were just thrilled that she could then, you know, have less debt. But she was supposedly, according to Dave Kennedy, qualified for more debt, based on his qualification and her income and so forth. But we chose to just gift it, you know, and not do a second mortgage.
(Emphasis added).
¶ 29. Adams specifically included herself in the seller’s decision to “gift” the down payment to Curley. It is obvious that Adams was fully aware that Zehr, the seller, intended to pay Curley’s down payment by funneling money from Zehr through David’s companies Maranatha *75 Services, Inc., and Windsor Financial, then through Larry, the closing agent, and then finally back to Zehr at closing. Neely even testified that when she arrived at the closing, David was in the parking lot, where he delivered the down payment check to Curley. Further, Neely testified that David told Curley to give the check to Larry, the closing agent.
¶ 30. Zehr testified that he buys, renovates, and sells houses. Zehr admitted that he never met Curley. He first saw her at the Commission hearing. Zehr stated that in his business in the Jackson metropolitan area, he provided down payment assistance 80% of the time. Zehr testified that David Smith appraised the house for $130,000. Two years earlier, the house at issue had been sold for $28,000. According to Zehr, he used Smith’s appraisal services because Smith was a neighbor convenient to his home, a friend, and someone who “couldn’t be bought.” When asked about the sale contract that he signed (in which the buyer was to pay a 20% down payment), Zehr claimed to have a loss of memory. He denied having any memory of the events involving the down payment assistance program. However, he admitted he signed two checks to Regions Bank and Maranatha Services, Inc., for the down payment assistance and Mar-anatha’s fee. When asked whether he received $126,000 for his house, he answered, “[tjhat’s what it shows on the HUD.” In reality, considering that Zehr provided the down payment so Curley could qualify for a HUD loan, Zehr sold his house for $100,800, which was 100% of the loan. When asked whether he would have sold the house for $100,000, Zehr answered, “I can’t say.”
¶ 31. Robert Praytor, the first witness to testify, testified that he was the administrator for the Mississippi Real Estate Commission, a licensed real estate broker, a certified general real estate appraiser, and a professor of real estate at Delta State University. Praytor testified that Curley contacted the Commission quite upset that she might have purchased a piece of property where the price had been inflated and that other matters were not properly done. Curley said she had recently seen things on television and heard things on the radio about some information about mortgage fraud in the Jackson area. According to Praytor, Curley’s house was listed on the Multiple Listing Service two years earlier and had sold for $28,000. Praytor also testified that Adams was a member of the Multiple Listing Service at that time. Praytor discussed the responsibilities that a dual listing agent owes to a buyer. According to Praytor, the Appellants violated their duties to Curley regarding informing the buyer of all relevant information concerning the transaction. Praytor explained how the HUD closing statement was false and misleading to any third party who might rely on it. Praytor also testified that the mortgage was actually a high-risk mortgage where the buyer did not pay a 20% down payment. According to Praytor, this was an uninsured 100% mortgage where the seller had paid the borrower’s down payment and effectively reduced his selling price to approximately $100,000.
¶ 32. To summarize, Zehr owned a house that had two years earlier been sold for $28,000, offered it for sale for $130,000, agreed to sell it for $126,000, placed the 20% down payment (funneled through at least two companies) in the buyer’s account to inflate the borrower’s apparent status so that she could falsely qualify for a loan, and then finally sold the house, despite what was represented in the pa-perwoi’k, for less than $100,000. Adams, Neely, and Palmer knowingly participated in Zehr’s elaborate scheme. Based on their dual listing agent status, they owed *76 Curley fiduciary duties and duties of good faith and fair dealing. Adams, Neely, and Palmer abdicated their agency responsibilities and made their commissions on the sale of the property. The Commission’s decision to discipline the Appellants by temporarily suspending their licenses and ordering continuing education is supported by substantial evidence. Accordingly, this issue is without merit.
¶ 33. THE JUDGMENT OF THE CIRCUIT COURT OF MADISON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
LEE AND MYERS, P.JJ., BARNES, ROBERTS AND CARLTON, JJ., CONCUR. KING, C.J, CONCURS IN RESULT ONLY. IRVING, J., CONCURS IN PART AND IN THE RESULT. ISHEE, J., CONCURS IN PART. CHANDLER, J., NOT PARTICIPATING.

. Adams testified that Curley told her that problems in the neighborhood led to Curley's decision to sell the house. However, Curley broke down on the witness stand and testified that she had to sell the house because she could not afford the mortgage payments.

. It was disputed whether Curley first contacted the Commission or whether the Commission first contacted Curley.

. David Kennedy is the only listed officer of Windsor Financial, LLC. Curiously, David is also the only listed officer of the charitable organization and conduit used in this transaction, Maranatha Services, Inc. Larry Kennedy, the closing agent, is David's cousin.