# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-SA-01086-SCT

*RITA BREECE McINTOSH*

*v.*

*MISSISSIPPI REAL ESTATE COMMISSION*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/11/2015 |
| TRIAL JUDGE: | HON. JOHN HUEY EMFINGER |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | K. F. BOACKLE |
| | JOE S. DEATON, III |
| | RICHARD JASON CANTERBURY |
| ATTORNEYS FOR APPELLEE: | WILLIAM HOLCOMB HUSSEY |
| | JOHN L. MAXEY, II |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | REVERSED AND RENDERED - 05/25/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1. Rita McIntosh appeals from the Rankin County Circuit Court's judgment affirming the Mississippi Real Estate Commission's disciplinary order against McIntosh, finding that McIntosh had engaged in "improper dealing." According to the order, McIntosh, as exclusive agent of the seller, interjected herself into the lender's appraiser selection process and then tried to keep the selected appraiser from completing the appraisal assignment. The Commission imposed a ninety-day suspension, plus a thirty-day suspension held in abeyance, along with eight months' probation and continuing education courses.

¶2.    Because we find that McIntosh's alleged conduct did not constitute improper dealing as contemplated by the Mississippi Real Estate Brokers License Act, we reverse the circuit court's judgment and render judgment in favor of McIntosh.

**FACTS**

¶3.    McIntosh holds a real estate broker's license issued by the Commission pursuant to Mississippi Code Section 73-35-1 to 73-35-35.  In December 2013, McIntosh executed an exclusive listing agreement for the sale of a home located in Pearl, Mississippi.  The sellers wanted to list the property for $134,000; but McIntosh suggested a $126,300 listing price, based on her calculations of the sale prices per square foot in the area.

¶4.    A prospective buyer expressed interest in the property through the buyer's real estate agent, Deborah Hines.  Hines informed McIntosh on or about January 18 or 19, 2014, that the prospective buyer wanted to make an offer of the listing price of $126,300.

¶5.    That same day, McIntosh asked Hines what lender the buyer had chosen for mortgage financing.  Hines told McIntosh, Red Rock Mortgage.  McIntosh expressed concern about Red Rock, having had a difficult time getting Red Rock to the closing table in the past.  Hines reassured McIntosh she had done numerous transactions with Red Rock and its loan processor, April Lowery.[1]  McIntosh then requested Hines to advise Red Rock not to use Logan Long as an appraiser for the Pearl property.  McIntosh said her agency had a history of at least seven Federal Housing Administration (FHA) appraisals coming in below the sales price due to Long.  To McIntosh's knowledge, Long was the only appraiser with whom they

---

[1] According to the record, the buyer in this case was Lowery's brother-in-law.

2

had these issues. Hines declined McIntosh's request but provided McIntosh with Lowery's contact information at Red Rock.

¶6. The next day, the seller accepted the buyer's offer. That same day, McIntosh sent an email to Lowery, copying buyer's agent Hines, which stated:

> I have no problem with any knowledgeable and qualified FHA appraiser; however we have had some real seemingly unfair experiences with an appraiser, Logan Long. I hope that he is not on your list and if there is a way to opt out if he should be selected. We have a history of at least 7 FHA appraisals that have come in below sales price by Mr. Long. To my knowledge, he is the only appraiser that we have had these consistent and on going issues with.

¶7. Hines replied: "I don't know this guy [and you] know we can't pick [an] Appraiser. . . ." To which McIntosh responded: "I know, I am just hoping he is not on the Red Rock list. We had another sale bite the dust last week in Bainbridge and he was the FHA appraiser."

¶8. Lowery responded to McIntosh by email: "We do not choose the appraiser, the FHA Appraisal Management company chooses.[2] Logan Long is in their rotation list. I hope we don't have any appraisal issues."

¶9. On February 3, 2014, McIntosh learned Long had been engaged by the buyer's lender to appraise the subject property. McIntosh received a text message from Long at approximately 3:15 p.m. that afternoon, requesting information regarding access to the

---

[2] Real Shield was the appraisal management company (AMC) used by Red Rock in this instance. Later, at the hearing before the Commission in this case, it came out that Real Shield is not registered in Mississippi to do business as an AMC–a violation of Mississippi Code Section 73-34-103 (Rev. 2012). Robert Praytor, administrator for the Commission, testified this fact was immaterial to the complaint against McIntosh.

property for appraisal inspection. McIntosh replied to Long's text: "Hold up Logan I will get back to [you]." McIntosh did not get back to him.

¶10. Minutes after learning Long was the appraiser for her client's property, McIntosh communicated with Hines and included a copy of Logan's text she had just received: "Look at this . . . . It's that appraiser that [has] killed every one [of the] sales every time. Please ask [Lowery at Red Rock] if there is any way we can pass on him. Anyone but him."

¶11. Hines replied: "You will have to call [Lowery]. I can't request any Appraisal Person. The value is in the house so [hopefully] we won't have any problems."

¶12. McIntosh responded to Hines: "[You] don't know him. Spiteful."

¶13. The next day, on February 4, Long texted McIntosh again, requesting access to the property. Long asked if there was any news on the property and explained that the appraisal was due two days later, on February 6. McIntosh did not respond to Long's second request.

¶14. Shortly after receiving Long's second text, McIntosh communicated with Hines and included a copy of Long's second text.

¶15. Long later testified that he was required to update the status of his appraisal assignment through an online web portal. Long reported to Real Shield that he had received no reply from McIntosh regarding access to the property to complete his appraisal. Real Shield responded by online message and instructed Long: "It's got a key, MLS, vacant. Go anytime per agent." Long thereafter went and conducted the appraisal and turned it in to the lender.

¶16.   Long appraised the value of the subject property at $117,000, which was less than the contract price of $126,300.  Lowery communicated the information to both Hines and McIntosh in an email:

> Good afternoon, I received the appraisal for [the property].  It seems we have a problem with the appraised value of $117,000 and the sales price of $126,300.  I have attached a detail letter from the appraiser stating why the value was determined to be what it is.  Please advise how to proceed at this point. The borrowers are coming in the office today at 4:30 to bring additional information for the loan. . . .

¶17.   McIntosh responded to Lowery, copying Hines: "No way in Hell.  So sorry for all involved.   Please tell [Hines] not to bring in the Buyers until, unless we can get this resolved."  McIntosh added: "Not acceptable.  Who did the appraisal?  Did Logan Long go in after I asked him to wait?"

¶18.   Lowery responded, requesting that McIntosh refrain from such language in her correspondence as Lowery believed it reflected on McIntosh's image as a realtor.  McIntosh replied she wasn't concerned about her image and asked for a copy of the appraisal submitted by Logan to his client, the buyer's lender, Red Rock.  McIntosh also made clear to Lowery that Long had not obtained her permission to enter her client's property to perform his appraisal inspection.

¶19.   McIntosh later testified that she was shocked by the appraisal because she initially believed the house was 1,350 square feet, and there was "no way" the house could have appraised at the value assessed by Long.  McIntosh also maintained throughout the proceedings that Long had not been authorized to complete the appraisal, stating:

5

"Regardless of what he says, [Logan] entered into the property without permission, . . . when permission had been explicitly denied."

¶20. McIntosh admitted that, upon discussing the appraisal with her client, McIntosh realized the client was mistaken about the actual square footage used in the original listing price. Long's appraisal had reflected a lesser square footage than McIntosh had calculated. Accordingly, McIntosh and her clients decided to renovate a garage storage closet into an office accessible from the house in order to increase the square footage.[3] They then requested Long appraise the house again. Long conducted another appraisal and thereafter valued the property at $120,000.[4]

¶21. McIntosh testified that if Long had "kept his first math, [the value] would have been around [$]125[,000], which would have been doable for the seller without a lot of pain. It wouldn't have been a hard decision. But that did not happen."

¶22. After Long's second appraisal, McIntosh spoke with Sean Cornwell, Lowery's boss at Red Rock, to inquire about her options. According to McIntosh, her conversation with Cornwell occurred during the "dispute valuation process" and Cornwell had described to her "where he allowed [McIntosh] to submit additional comps to the underwriter." McIntosh

---

[3] When McIntosh's client had purchased the property, the garage and a storage room had been converted to a bedroom and a closet. The client later restored the garage. When the property was listed, the client forgot about the heated and cooled area previously used as a closet.

[4] According to McIntosh, the square-foot price based on Logan's first appraisal was $91.80 per square foot. That amount decreased to $88.00 per square foot upon Logan's second appraisal.

6

said she had no intention of filing a "complaint," and she was just trying to get more information. McIntosh stated:

> I did mention to Sean Cornwell [that] I should visit the Mississippi Appraisal Board in an attempt to see why Long's value per square foot decreased with his second appraisal. . . . I merely stated my displeasure with the appraiser who had been selected, and whom I knew from prior experiences had a history of arriving at value opinions that I believed were not supported by appropriate market data and based on what I believe to be his incorrect interpretations of appraisal methodology and regulations. . . .

¶23. Long filed a complaint with the Commission on February 20, 2014, claiming that McIntosh had violated provisions of the Dodd-Frank Act and Mississippi law by attempting to have the appraisal steered to "anyone but him" before he was engaged by the buyer's lender. Logan testified he heard about McIntosh's communications from Hines and Lowery. Despite the complaint, the parties closed on the house in March 2014, for $120,000–the amount of Long's second appraisal.

¶24. The Commission requested and received information and responses from Long, McIntosh, Hines, and Lowery. After its investigation, the Commission proceeded on its own complaint against McIntosh, alleging she had engaged in "improper dealing" in violation of the Mississippi Real Estate Brokers License Act, as amended, Sections 73-35-1 to 73-35-35, specifically Section 73-35-21(1)(m).

¶25. This section, which was amended and renumbered in 2016, prohibits "[a]ny act or conduct, whether of the same or a different character than hereinabove specified, which constitutes or demonstrates bad faith, incompetency or untrustworthiness, or dishonest,

fraudulent or improper dealing." The statute is now designated as Section 73-35-21(1)(n), and contains the following provision:

> However, simple contact and/or communication with any mortgage broker or lender by a real estate licensee about any professional, including, but not limited to, an appraiser, home inspector, contractor, and/or attorney regarding a listing and/or a prospective or pending contract for the lease, sale and/or purchase of real estate shall not constitute violation of this section.

Miss. Code Ann. § 73-35-21 (Supp. 2016).

¶26. In the complaint, the Commission alleged the facts at issue and then referenced the Dodd-Frank Act.

¶27. After service of the complaint, negotiations ensued between McIntosh and the Commission for entry of an agreed order in lieu of a formal hearing. The Commission offered disciplinary terms that included a thirty-day suspension. McIntosh declined the offer and elected to have a formal hearing.

¶28. Following the hearing, the Commission issued a disciplinary order, signed by Robert Praytor,[5] imposing a ninety-day suspension, plus a thirty-day suspension held in abeyance, eight months' probation and continuing education courses. In the order, the Commission found that the evidence undisputably showed that McIntosh acted to have Long's assignment "either not be consummated or to not cooperate with his efforts to complete the assignment."

---

[5] In addition to signing the disciplinary order, Praytor oversaw the investigation of McIntosh, signed the complaint, and testified as an expert witness at the hearing. The circuit court expressed concern with this procedure, but found nonetheless that it has been approved by appellate courts in other administrative cases. The record also shows that, as administrator for the Commission, Praytor has direct oversight over the Mississippi Appraisal Board.

The order then stated, "In either case the independence of Mr. Long to perform the appraisal was threatened."

¶29.   As did the complaint, the order noted that "[r]ecent legislative and regulatory enactments pursuant to the *Dodd-Frank* legislation attempted to enforce and assure the independence of appraisal practices,"– referencing a certain provision of Dodd-Frank. The order, however, then stated that McIntosh was not charged with violating Dodd-Frank, and McIntosh's conduct constituted "improper dealing" pursuant to former Section 73-35-21(1)(m).

¶30.   McIntosh appealed to the Rankin County Circuit Court, which affirmed the Commission's order. McIntosh now appeals to this Court raising a number of issues. Because we find that McIntosh's conduct did not constitute improper dealing in this instance, we discuss only the merits of that question. Additional facts, as necessary, will be related in the discussion.

## STANDARD OF REVIEW

¶31.   As reiterated in *Harris v. Mississippi Real Estate Commission*, 500 So. 2d 958, 962 (Miss. 1996) (quoting *Eidt v. City of Natchez*, 421 So. 2d 1225, 1231-32 (Miss. 1982), *superseded on other grounds*)),"courts cannot enter the field of the administrative agency." Thus, the scope of judicial review of an administrative agency order is limited to whether or not the Commission's order is (1) supported by substantial evidence, (2) arbitrary or capricious, (3) beyond the power of the administrative agency to make, or (4) violated some statutory or constitutional right of the complaining party. *Id*.

¶32. The Commission has the authority to revoke or suspend the license of a broker under Mississippi Code Section 73-35-21. This authority, however, should be used judiciously and cautiously since the right given to the Commission also takes from the licensee the right to do business and make a living in the practice of his or her profession. *Id*. The burden of proof placed upon the Commission to revoke or suspend a broker's license is clear and convincing evidence. *Miss. Real Estate Comm'n v. White*, 586 So. 2d 805, 808 (Miss. 1991).

## DISCUSSION

**Whether McIntosh's conduct constituted improper dealing.**

¶33. As mentioned, the Legislature recently amended Section 73-35-21(1)(m), now numbered Section 73-35-21(1)(n), by prescribing that "simple contact and/or communication with any mortgage broker or lender by a real estate licensee about any professional, but not limited to, an appraiser, . . . shall not constitute a violation of this section." *See* Miss. Code Ann. § 73-35-21(1)(n) (Supp. 2016). As Section 73-35-21 was being amended and modified while the appeal of this case was pending, we apply Section 73-35-21(1)(n). *See USPCI of Mississippi, Inc. v. State ex rel. McGowan*, 688 So. 2d 783, 786-87 (Miss. 1997) ("An amended act is ordinarily construed as if the original statute had been repealed, and as far as any action after the adoption of the amendment is concerned, as if the statute had been originally enacted in its amended form.").

¶34. Here, McIntosh's communications with the lender asking if her client could "opt out" if Long was selected to conduct the appraisal, did not constitute "improper dealing" as

10

contemplated by Section 73-35-21(1)(n). Again, this section plainly states that "simple contact and/or communication with any mortgage broker or lender by a real estate licensee about . . . an appraiser . . . shall not constitute a violation of this section." Prior to Long's selection, McIntosh merely communicated her concerns about a particular appraiser, and she asked what her client's options were if he were selected. Further, McIntosh qualified her communications by saying that she had no problem with any other qualified appraiser conducting the appraisal.

¶35. As to McIntosh's conduct after Long's selection, we acknowledge that this presents a closer question, but we conclude, nonetheless, that this did not constitute improper dealing on the facts of this case.

¶36. Based on the Commission's disciplinary order, McIntosh's conduct constituted improper dealing because it "threatened" appraiser independence. As mentioned, the Commission found that McIntosh acted either to have Long's appraisal assignment not be consummated or to not cooperate with Long's efforts to complete the assignment. The Commission said that "[i]n either case, the independence of [Long] to perform the appraisal was threatened." The Commission then said:

> Mr. Robert Praytor, Administrator of the Commission and the Mississippi Appraisal Board, testified as an expert witness qualified in real estate practices under the Real Estate License Law by virtue of his experience, education and training. In his opinion, McIntosh's actions were improper dealing when she stepped outside her limited responsibility which was solely to her client, the seller. He further stated McIntosh had no part in the selection of the appraiser and her only role was to cooperate with the process to further the transaction. It was his opinion this was a serious violation of the license law . . . .

11

¶37. Finally, the Commission concluded that "[t]he above and foregoing described acts of [McIntosh] constitutes . . . improper dealing."

¶38. First, it may be true that Praytor holds the opinion that the Commission's rules and regulations provide that real estate agents should "play no part in the selection of the appraiser," and that McIntosh's "only role was to cooperate with the process." But the Commission made no finding that McIntosh's conduct violated any of its rules and regulations, and we find no such violation.

¶39. Second, and moreover, while the "threat" to appraiser independence is no doubt a legitimate concern, the same threat exists, however, with a seller's right to contract. As the dissent points out, a seller may include an opt-out or restriction clause that precludes prospective buyers from using a certain lender and/or appraiser. While the dissent is of course correct that should have been done here, nothing in the record sufficiently illustrates to us that a licensee would, or should, know this is an option for his or her clients. This is problematic because it indicates ambiguity in this area between two divergent interests and/or concerns–the former which potentially could infringe upon the latter, without proper guidelines from the Commission.

¶40. The ambiguity here becomes even more apparent given Praytor's above-mentioned response with regard to the question posed about preexisting conflicts between a licensee and an appraiser. Praytor's response suggests that the same conduct now charged to constitute improper dealing would not have constituted such if McIntosh had proceeded differently somehow. In fairness to Praytor, who obviously is very knowledgeable in this entire area,

12

we think he likely meant–as Justice King calls attention to, and we agree with–the buyer's right to contract. But this still circles us back to our previous concern: how would a licensee know this is an option for his or her clients? Praytor's response also raises–in addition to others–this question: What constitutes a conflict, and who decides that? At the hearing, the Commission refused to get into the matter because Long said he was prohibited by certain appraisal rules from discussing prior appraisals he performed where McIntosh was the seller's broker. This is another conundrum we see.

¶41. In short, there simply are too many gaps here that need to be filled in by the Commission, but which cannot be done through ad-hoc sanctioning along the way. The Commission, under the Act conferring upon it the authority to regulate real estate business conducted in this state, has the authority to adopt rules and regulations necessary for the conduct of that business. Miss. Code Ann. § 73-35-35 (Rev. 2012). But it must do so with adequate specificity and notice to its licensees that comports with due process.

¶42. Here, we find that, while some of McIntosh's conduct following Long's selection may, in the opinion of some, have been improper, it did not constitute "improper dealing" in this instance. This is not to say that such conduct may not be sanctionable in the future, were the Commission to set forth clear rules and regulations proscribing such conduct, that do not exceed its rulemaking authority. But none yet exists.

## CONCLUSION

¶43. For these reasons, we reverse the circuit court's judgment and render judgment in favor of McIntosh.

13

¶44.	**REVERSED AND RENDERED**.

	**DICKINSON AND RANDOLPH, P.JJ., KITCHENS, MAXWELL AND CHAMBERLIN, JJ., CONCUR. KING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, C.J., AND COLEMAN, J.**

	**KING, JUSTICE, DISSENTING:**

¶45.	Because this is a close case, as the majority admits, and because of the deferential standard of review we must afford the agency's decision, I respectfully dissent.

¶46.	As the majority notes, "courts cannot enter the field of the administrative agency." ***Harris v. Miss. Real Estate Comm'n***, 500 So. 2d 958, 962 (Miss. 1996); Maj. Op. ¶ 31. This Court will reverse an administrative agency decision *only* when 1) the decision is not supported by substantial evidence, 2) the decision is arbitrary and capricious, 3) the decision was beyond the power of the agency, or 4) the decision violated a statutory or constitutional right of the complaining party. *Id.* The majority does not contend that the Mississippi Real Estate Commission's (MREC) decision was arbitrary and capricious, was beyond its power to make, or violated any of McIntosh's statutory or constitutional rights. Thus, the sole issue is whether the Commission's decision was supported by substantial evidence. "Recognizing the peculiar expertise of administrative agencies when acting within their proper sphere, we have consistently refused to overturn any administrative agency's finding based upon substantial evidence." *Id.* (quoting ***Eidt v. City of Natchez***, 421 So. 2d 1225, 1231-32 (Miss. 1982)). "The agency charged with regulating certain activities knows how to police its own. This seems especially true where an agency commission comprised of fellow practitioners, as is the Real Estate Commission, sits in judgment of one of its own." ***Harris***, 500 So. 2d

14

at 963. The MREC is both the trier of facts and the judge of witness credibility. *Nelson v. Miss. State Bd. of Veterinary Med.*, 662 So. 2d 1058, 1062-63 (Miss. 1995). Additionally, an agency's interpretation of the statute under which it operates, such as the MREC's interpretation of Section 73-35-21(1)(n), is entitled to great deference, "and must be upheld unless it is so plainly erroneous or so inconsistent with either the underlying regulation or statute as to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." *Queen City Nursing Ctr., Inc. v. Miss. State Dep't of Health*, 80 So. 3d 73, 84 (Miss. 2011) (quoting *Miss. State Dep't of Health v. Baptist Mem'l Hosp.-DeSoto, Inc.*, 984 So. 2d 967, 981 (Miss. 2008)).

¶47. The majority attempts to claim that the Commission used some "ambiguous" definition of improper, but improper dealing has been explicitly defined by our Court of Appeals, so licensees are on notice as to what constitutes improper dealing, and the meaning is clear and unambiguous. "Improper" is defined as "[i]ncorrect, unsuitable or irregular" or "[f]raudulent or otherwise wrongful." *Improper*, Black's Law Dictionary (10th ed. 2014). "Dealing" is defined as "[t]he business activities or relationships that someone is involved in" or "[t]he activity of buying, selling, or doing business with people." *Dealing*, Black's Law Dictionary (10th ed. 2014). Thus, taking unfair financial advantage of someone is not required to meet the definition of "improper dealing." Such may be found simply with "incorrect" or "irregular" business activities.

¶48. Indeed, as noted, the Mississippi Court of Appeals has defined the term. In *Farris v. Mississippi Real Estate Commission*, the real estate agents argued that to find improper

15

dealing, some sort of fraudulent or bad faith intent must exist and harm must be inflicted on one or more parties. *Farris v. Miss. Real Estate Comm'n*, 994 So. 2d 229, 232 (Miss. Ct. App. 2008), *cert. denied* (November 6, 2008). In that case, the real estate brokers were using contracts and forms with a Century 21 (Tennessee-based) logo for Mississippi Farris Realty transactions, without the knowledge of Century 21. *Id.* at 231-32. The Court of Appeals cited the sixth edition of Black's Law Dictionary and noted that "[i]mproper is defined as '[n]ot suitable, 'unfit,' 'not suited to the character, time, and place,' or 'not in accordance with fact, truth, or right procedure.'" *Id.* at 233; *see also Ryan v. Miss. Real Estate Comm'n*, 2017 WL 412996, __ So. 3d __ (Miss. Ct. App. Jan. 31, 2017). While the court acknowledged that no evidence existed that the brokers intended to defraud or misrepresent facts, it found "substantial evidence in the record that they engaged in improper dealing" because they used "Tennessee contracts, which did not comply with Mississippi law . . . . These are unsuitable practices that are not in accordance with correct procedure for real estate practice in Mississippi . . . ." *Farris*, 994 So. 2d at 233. The court thus concluded that substantial evidence existed that the brokers' actions constituted improper dealing. *Id.* In *Palmer v. Mississippi Real Estate Commission*, the Court of Appeals found substantial evidence of improper dealing even though the conduct only allegedly posed a risk to an investor in the secondary market. *Palmer v. Miss. Real Estate Comm'n*, 14 So. 3d 67, 73 (Miss. Ct. App. 2008). In the sale, the seller provided the buyer with the down payment, which was not reflected in the documents, thus, "[a]n investor in the secondary market would not be aware of the details of the transaction and in particular since it would not be alerted

16

that the down payment by the buyer had actually not originated from her funds." *Id.* In such situations, where a buyer does not invest substantial equity, the probability of default increases. *Id.* Thus, the real estate brokers' actions in the case constituted improper dealing, because it "was a high-risk loan characterized as a low-risk loan by the actions of the seller, all unbeknownst to HUD and the lender." *Id.*; *see also Gussio v. Miss. Real Estate Comm'n*, 122 So. 3d 783, 787 (Miss. Ct. App. 2013) (By MREC rule, a failure to respond to MREC written communications was deemed improper dealing; brokers failed to respond to written communications, and thus were guilty of improper dealing).

¶49.    Turning to the facts at hand, even assuming retroactive application of the new statutory language, McIntosh did more than simply communicate about an appraiser. She actively tried to block Long from being chosen as the appraiser in multiple communications with multiple people, all while failing to put any opt-out clause or restriction in the contract. Coupled with the fact that *after* Long was chosen, she actively denied him, the assigned appraiser, entry into the property, attempted to have him removed as appraiser, and protested when he did gain entry to the property, it is certainly reasonable to conclude that McIntosh engaged in irregular or unsuitable business activities. While this Court, if we sat as the trier of fact and judge of witness credibility, may have made a different finding than that of the MREC, that is not the operative standard of review. The standard of review is one of deference, both to the MREC's findings, and to its interpretation of "improper dealing." Under the deferential standard of review, substantial evidence certainly exists that McIntosh engaged in improper dealing, or irregular business activities, with her attempted interference

17

with the appraisal process. Indeed, the majority admits that this is a close case, that a contractual opt-out "should have been done here,"[3] and that this exact conduct may constitute improper dealing "in the future." But the majority decides that due to some "ambiguity" that does not exist, as the term is clear and has been defined by the courts, it should both ignore the deferential standard of review and engage in fact-finding, and it therefore reverses the Commission.

¶50. This Court is not the trier of fact or the judge of witness credibility in an agency proceeding. I believe that the majority in this case engages in fact-finding and fails to give the agency decision the deference it is due under our standard of review. Because the decision of the MREC is supported by substantial evidence, I would affirm it, and therefore I respectfully dissent.

**WALLER, C.J., AND COLEMAN, J., JOIN THIS OPINION**.

---

[3]The majority repeatedly asks how a licensee would know they could put an opt-out in a contract. This question is befuddling. Why would a licensee *not* know that? People ask that all manner of unique provisions be placed into real estate contracts, an opt-out provision is no different.