# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2025-KA-00011-COA

JACQUEZE MARSHALL                                                    APPELLANT

v.

STATE OF MISSISSIPPI                                                  APPELLEE

DATE OF JUDGMENT:            12/19/2024
TRIAL JUDGE:                 HON. WILLIAM HUNTER NOWELL
COURT FROM WHICH APPEALED:   BOLIVAR COUNTY CIRCUIT COURT,
                             SECOND JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:      OFFICE OF STATE PUBLIC DEFENDER
                             BY: MOLLIE MARIE McMILLIN
ATTORNEY FOR APPELLEE:       OFFICE OF THE ATTORNEY GENERAL
                             BY: ALLISON ELIZABETH HORNE
DISTRICT ATTORNEY:           BRENDA FAY MITCHELL
NATURE OF THE CASE:          CRIMINAL - FELONY
DISPOSITION:                 REVERSED AND REMANDED - 06/09/2026
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., EMFINGER AND LASSITTER ST. PÉ, JJ.**

**LASSITTER ST. PÉ, J., FOR THE COURT:**

¶1.     Jacqueze Marshall was indicted for the first-degree murder of Jafarrion Lewis in September 2021. Following a trial, a Bolivar County jury found Marshall guilty as charged.[1] On appeal, Marshall argues that the trial court erred by refusing to admit evidence that supported his theory of defense and that he was prejudiced by the error. Specifically, Marshall sought to introduce another man's indictment, bond information, and an order of nolle prosequi as to the man's indictment. The indictment included a count of intimidating

---

[1] Marshall was first tried in May 2022, but his conviction was reversed by this Court. *Marshall v. State*, 393 So. 3d 1113 (Miss. Ct. App. 2024).

a witness—Jafarrion Lewis—who was the sole witness to a crime. Lewis was later killed, and the indictment was nolle prossed.

¶2. After review, we hold that the trial court abused its discretion by refusing to admit the documents Marshall presented, which were relevant and did not violate Mississippi Rule of Evidence 403. We also hold that the exclusion of the evidence was not harmless, and we reverse and remand for a new trial.

## FACTS AND PROCEDURAL HISTORY

¶3. Chad Lankawell was driving on Pearman Road in Cleveland when he noticed a car in front of him stopped in the road. He saw the car reverse and drive around something on the right side of the road before pulling over. As Lankawell approached, he noticed a body in the road, which was later identified as Lewis. Lankawell and the driver of the other car got out and looked at Lewis's body. Lankawell checked for a pulse but found none. Lankawell told the other man he would call the police, and the other man left.

¶4. Lankawell did not catch the other man's name but did give law enforcement the license plate number on the man's red pickup truck to law enforcement. At trial, law enforcement officers were not able to recall if they had been able to locate the man or the owner of the truck. Lankawell testified that he did not think the man seemed nervous or like he was trying to hide.

¶5. Deputy James Winston of the Bolivar County Sheriff's Department testified he responded to the scene sometime after 6:00 p.m. Deputy Winston noticed that Lewis

2

appeared to have been shot. He found two 9-millimeter shell casings near Lewis's body. Officers also collected samples of broken glass found "approximately an eighth to a quarter mile" south of Lewis's body.

¶6.     Deputy Chris McCain viewed the surveillance footage from a convenience store near the road where Lewis was found. Deputy McCain testified that an image from the recording showed Marshall's blue pickup driving in the direction of where Lewis's body was found. Deputy McCain testified that the image was taken at approximately 6:45 p.m. on June 19, 2021.

¶7.     Marshall's father, Lee, testified at trial he received a call from Marshall's girlfriend, Codijah Alexander, on June 19, asking if she could bring over some of Marshall's clothes. When Alexander arrived, she was with another man whom Lee did not know. Alexander brought a bag that she said had Marshall's clothes in it, and Lee told her to put it in the garage. Lee testified that he did not look or touch the bag. One day shortly thereafter, law enforcement officers came to Lee's house and took the bag. Lee never saw anyone other than Alexander and law enforcement with the bag. Lee could not recall at trial how law enforcement learned about the bag, but Sergeant Jonathan Trotter testified at trial that Lee called him personally to tell him about the bag.

¶8.     Sergeant Trotter testified that Lee told him Alexander had brought a bag of clothes to his house and that he (Lee) wanted to get rid of it. Sergeant Trotter retrieved the bag, which he testified felt too heavy to be only clothes. Sergeant Trotter took the bag to Chief

3

Gerald Wesley's home, where they and Deputy McCain opened it. The bag contained some clothing and a .380-caliber Jimenez Arms firearm.

¶9.     Around 9:00 or 10:00 p.m. on June 19, Chief Patrick Johnson of the Shelby Police Department learned that the sheriff's department was looking for Marshall. Chief Johnson located Marshall in a blue Chevrolet pickup truck at the Super Saver in Shelby. Chief Johnson testified that Marshall was standing outside the truck when he approached, and he briefly detained Marshall until the sheriff arrived.

¶10.     After Marshall's arrest, Deputy McCain photographed Marshall's truck. He noticed that the passenger side window was shattered. Deputy McCain also swabbed Marshall's hands for gunshot residue and sent the samples to the crime lab. During the swabbing, Marshall told Deputy McCain that he had been with Alexander most of the day and had gone to a party at Lee's house.

¶11.     Chief Johnson already knew Marshall because he knew Marshall's girlfriend, Alexander. Alexander and Chief Johnson's wife are cousins. The day after Marshall's arrest, Alexander and her cousin Markees Parker-Shorter called Chief Johnson and told him they had a weapon to turn over. Chief Johnson met with Alexander and Parker-Shorter, and they gave him a 9-millimeter Jimenez Arms firearm. Alexander claimed that Marshall had stolen it. Chief Johnson turned the gun over to Sergeant Trotter.

¶12.     Alexander was unavailable as a witness but had testified at a previous trial. Her testimony was read into the record. Alexander testified that she and Marshall were not dating

on June 19, but they had been together in Shelby that day to take family photos with their children. She did not see him after the photo session. Alexander testified that sometime that night or the next day, she heard rumors that the police were looking for Marshall.

¶13.    Alexander identified the 9-millimeter handgun she had turned over to Chief Johnson. Alexander testified that it was her gun and had been purchased by her cousin, Parker-Shorter. Alexander said that she kept the gun at her home, stored away from the children, and did not let anyone use it. She was not sure if Marshall had access to it.

¶14.    Alexander also identified the bag containing clothes and a .380-caliber firearm that she had stashed at Lee's house. Alexander testified that she told Lee what was in the bag and that she wanted no part in whatever was going on. Alexander said Parker-Shorter had seen the bag at her apartment, and after a discussion, she decided to get rid of the bag.

¶15.    Parker-Shorter testified that he was living with Alexander in June 2021. He testified that he stopped by the apartment sometime between 5:00 and 7:00 p.m. to get ready for a party. Marshall met him at the door. Marshall told Parker-Shorter that he was waiting for Alexander to come home. While Marshall waited, he called Alexander and sent her new boyfriend threatening videos. Parker-Shorter testified that Marshall had two guns with him that he was using in the videos he was sending to Alexander's boyfriend. Parker recognized one of the guns, a 9-millimeter Jimenez Arms, as one he had purchased for Alexander. They usually kept the gun in a box at the top of a closet.

¶16.    Parker-Shorter testified that Marshall claimed he had killed someone with the guns

"in the country." Parker-Shorter did not recognize the name of the person Marshall claimed he had killed. Marshall said that the person had killed Marshall's cousin. Parker-Shorter testified that Marshall told him that he and Lewis were riding around in the country. Marshall said he shot with one gun at first until he ran out of bullets, so he switched to another gun. Marshall said Lewis jumped out of the car and ran, so Marshall followed him in his truck and continued to shoot him.

¶17.   Parker-Shorter told Marshall to leave the guns at the apartment. Parker-Shorter explained that he wanted the 9-millimeter gun to stay "regardless" because it was Alexander's, and he did not want the murder "to fall back on" either of them. Marshall left, and Parker-Shorter wrapped the guns in some clothes and put them in a closet until Alexander came home. They decided to turn the 9-millimeter gun in to police and give the other to Marshall's father.

¶18.   On cross-examination, Parker-Shorter admitted that at the time of Lewis's death, he had been indicted on various offenses and could have received up to thirty years if convicted. Parker-Shorter acknowledged that after he cooperated with law enforcement against Marshall, he had received only house arrest rather than prison time. But Parker-Shorter testified that he had not been told what to say by law enforcement and had always told the truth about Marshall's actions.

¶19.   Jesse Jackson Jr. was "very close" with Lewis and had been with him on June 19.[2]

_____

[2] Jackson's testimony was read into the record, as he was unavailable as a witness and

Jackson testified that he and Lewis were hanging out outside. Around 5:00 p.m., Marshall drove by in his blue pickup truck and parked across the street. Lewis walked across the street to talk to Marshall, telling Jackson that he would be right back. Jackson said the men spoke for a couple of minutes, then Lewis returned, picked up his red t-shirt, and told Jackson not to leave. Jackson watched Lewis get into Marshall's truck, and the truck drove away. Only Lewis and Marshall were in the truck. Jackson watched the truck head toward Aloe Street. Jackson said he had never seen Lewis and Marshall hang out before.

*Physical Evidence*

¶20. An autopsy revealed that Lewis had six gunshot wounds, and one bullet was recovered during the autopsy. A firearms expert from the Mississippi Forensics Laboratory, Starks Hathcock, testified that the bullet retrieved during the autopsy was a .380-caliber and came from the .380-caliber Jimenez Arms gun Alexander had left at Lee's house. Hathcock testified that the shell casing recovered near Lewis's body at the scene was a 9-millimeter and came from the 9-millimeter Jimenez Arms firearm that Alexander had given Chief Johnson.

¶21. Hathcock testified that the 9-millimeter firearm came to the lab with a partially loaded magazine. The gun could hold up to thirteen bullets (twelve in the magazine and one in the chamber) but had only nine when it was submitted to the crime lab. The unfired bullet casings were Winchester brand; so were the spent casings found at the crime scene. Hathcock

_____

had testified at Marshall's first trial.

7

said that the .380 was also partially loaded. It had a capacity of seven (six in the magazine and one in the chamber) and arrived with six bullets in the magazine.

¶22.    Dywana Broughton from the Mississippi Bureau of Investigation processed Marshall's truck after it was transferred to Jackson. Broughton was unable to find any blood stains in the truck, but she did find eight live .380-caliber bullets inside the truck. She found no spent shell casings. She did not try to process the truck's interior for gunshot residue. Broughton noticed that the passenger window was broken but that there were some glass shards still intact. She collected the shards and sent them to the crime lab.

¶23.    Jacob Burchfield, an expert in trace evidence, received those shards and the glass collected from the crime scene. He testified that the glass from the road "was consistent with the recovered known glass [from the truck] . . . based on the color, thickness, luminescence, the refractive index of the glass, and elemental composition." Burchfield could not conclude with certainty that the fragments from the side of the road came from the truck. Burchfield explained that the glass fragments from the road were not likely to be from any possible vehicle because once vehicle glass comes off the assembly line, "it becomes individualized glass" and would have changes based on environmental factors in the factory or time on the vehicle.

¶24.    Burchfield also tested the gunshot residue swabs from Marshall. He determined that particles indicative of gunshot residue were present on the back of Marshall's right and left hands. The results were not "positive" because some of the necessary particles were missing,

8

which Burchfield explained could have worn away by time and use of the hands.

*Evidence of an Alternate Suspect*

¶25.     Deputy McCain advised Marshall of his *Miranda*[3] rights, which Marshall waived. Deputy McCain testified that Marshall told him that he had been "hired by Cordarius Butler and his brother to kill . . . Lewis for $5,000." On cross-examination, Officer McCain testified that Marshall said he had not accepted any money from Butler. McCain testified that Marshall stopped short of actually admitting that he had killed Lewis. McCain testified that he did not arrest Butler or his brother because they were never able to find them.

¶26.     Marshall's counsel tried to ask McCain if Butler was "out on a murder bond," but the State objected, and a hearing continued out of the jury's hearing. The State argued that introducing that issue was "confusing and prejudicial to the jury," because the murder charge was "not evidence that [Butler] committed murder." Marshall's counsel responded that the bond issue was relevant because McCain claimed he could not find Butler, and Marshall wanted to ask if the outstanding bond would have been a way to locate and bring in Butler. Marshall's counsel also argued that it was relevant to Marshall's theory of defense, which was that someone other than he killed Lewis.

¶27.     Marshall's counsel then stated that he wanted to introduce an indictment against Butler for murder and for intimidation of a witness—Lewis. Marshall also wanted to introduce an order of nolle prosequi as to the indictment because Lewis had been killed.

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Marshall's counsel argued that the evidence was admissible under Rule of Evidence 902 and that it was relevant to prove Marshall's theory of defense: that Butler wanted Lewis dead because he was a witness against him in a murder case, that Butler offered Marshall money to kill Lewis, which he declined, so Butler killed Lewis, which led to the dismissal of the murder indictment. The trial court would not allow the evidence to be admitted, a ruling that is discussed in depth *infra*.

## ANALYSIS

¶28.    Marshall raises only one issue on appeal—the exclusion of evidence related to Butler's motive for killing Lewis. Marshall argues that the exclusion of this evidence "severely limit[ed] his ability to develop his theory of defense." Marshall's appeal focuses on three documents.[4]

¶29.    Exhibit D1 was a certified copy of Butler's bond paperwork showing that he was out on a $300,000 bond following charges for murder and possession of a firearm by a felon. The paperwork was dated April 5, 2019, two years before Lewis's death. Marshall's counsel told the court that he wanted to use Exhibit D1 to show that Butler was not in jail when Lewis was killed.

¶30.    Exhibit D2 was a three-count indictment from September 2019 charging Butler with murder, possession of a firearm as a felon, and "use of a threat and/or display of a firearm,

_____

[4] Marshall focuses on Defense Exhibits 1-3, though five total exhibits were offered for identification during Marshall's proffer.

to harass or intimidate and/or threaten Jafarrion Lewis, a person reasonably expected to be a witness in an official proceeding." Lewis—the victim in this case—had been expected to testify against Butler in his murder trial.

¶31. Exhibit D3 was a nolle prosequi order for the September 2019 indictment. The order stated that the State's motion to nolle pros the indictment was "well taken and should be sustained in that Jafarrion Lewis, the sole cooperating eye witness to Counts I and II and subject of Count III, was murdered on or about June 19, 2021[,] and the State no longer possesses sufficient evidence to put forth a prima facie case of the guilt of the defendant."

¶32. When Marshall tried to introduce Exhibit D1, the State objected, arguing that it was "inflammatory and prejudicial . . . and confusing." The State also argued that it was prejudicial for the jury to hear that Butler was out on bond for murder. Marshall's counsel argued that he had "an indictment, a bond showing . . . Butler was out and a nolle pros showing the murder case got dismissed after [Lewis was killed], and my client told the investigator, 'They hired me to try to kill him, but . . .' he didn't do it. And he didn't accept any money. I mean, that's the defense's case."

¶33. The State argued that the evidence was not relevant and that it would be confusing to the jury and "highly prejudicial" under Rule 403. The trial court sustained the State's objection, finding "under [Rule] 403 that its probative value is substantially outweighed by the danger of misleading the jury or confusing the issues. . . . [W]hile there may be some . . . ties, I don't find it to be relevant to this case."

11

¶34.    Following the close of evidence, Marshall renewed his argument as to Exhibits D1, D2, and D3 and provided some caselaw in support. The trial court, after reviewing the cases provided by Marshall, stood by its original ruling. The court also expressed skepticism about how the documents would be admitted, noting that they were not being used as impeachment or to cross-examine anyone. The court also stated that there would be "no way" to put the documents "in context without basically trying Mr. Butler's case in front of the jury."

¶35.    Marshall's counsel explained again that he was not trying to get into Butler's murder case but only wanted to examine Butler's connection to Lewis. He told the court that he "need[ed] to be able to explain why in the world . . . Butler would come to [Marshall] and ask him to kill someone," and counsel argued that the documents were "evidence of that, public evidence of that, that is relevant to this jury. . . . It shows why . . . Butler may have wanted . . . Lewis dead." The trial court refused to admit the evidence.

¶36.    We review the admission or exclusion of evidence for an abuse of discretion and will affirm unless we find that the trial court's error resulted in prejudice to the accused. *Edwards v. State*, 379 So. 3d 906, 911 (¶12) (Miss. Ct. App. 2024). "An abuse of discretion will be found only where the defendant shows clear prejudice resulting from undue restraint on the defense." *Cage v. State*, 149 So. 3d 1038, 1044 (¶13) (Miss. 2014). "The trial court's discretion must also insure the constitutional right of the accused to present a full defense in his or her case." *Ross v. State*, 954 So. 2d 968, 997 (¶56) (Miss. 2007). Indeed, "the Constitution guarantees criminal defendants a meaningful opportunity to present a complete

12

defense." *Ambrose v. State*, 254 So. 3d 77, 100 (¶52) (Miss. 2018).

¶37.    The State argues that the evidence Marshall offered was not relevant because it did not make it any more likely that Butler had murdered Lewis and that the jury already heard evidence that Butler offered Marshall money to kill Lewis. The State relies on *Kuebler v. State*, 205 So. 3d 623 (Miss. Ct. App. 2015), *reversed on other grounds*, 204 So. 3d 1220 (Miss. 2016), to support its conclusion that the trial court did not abuse its discretion by excluding evidence for a lack of connection between the alternative suspect and the crime.

¶38.    In *Kuebler*, the defendant sought to introduce the victim's toxicology report and text message that were allegedly probative of suicide. *Id.* at 641-43 (¶¶49-57). This Court held that the trial court did not abuse its discretion in excluding the toxicology report because the defendant had not proved a link between the victim's toxicology and alleged suicide and failed to present a witness to lay that foundation at trial. *Id.* at 641-42 (¶¶50-52). We similarly held that it was not an abuse of discretion to exclude text messages sent by the victim because "most of the texts . . . are not probative of suicide," and the ones about drug usage were inadmissible for the same reason as the toxicology report. *Id.* at 642-43 (¶57).

¶39.    However, unlike *Kuebler*, Marshall did not have to speculate to prove a connection between Butler and the victim, and he laid the foundation for establishing the evidence's relevance. Had Marshall not told Officer McCain that Butler offered him $5,000 to kill Lewis, there would have been no connection between Butler and Lewis, and the documents offered by Marshall would have been meaningless in the eyes of the jury. However,

13

Marshall's statement provided the connection between Butler and Lewis and established the relevance of Butler's indictment and order of nolle prosequi.

¶40.    The evidence of Butler's indictment for using a firearm to intimidate Lewis, who was a witness in Butler's murder trial, was relevant to whether Butler—not Marshall—could have wanted Lewis dead. Similarly, the order of nolle prosequi dropping the charges after Lewis's death further bolstered the connection between Butler and Lewis's death. It is difficult to see how this evidence would not have been relevant to Marshall's defense, which was that he did not do it and that the police ignored connections to Butler.

¶41.    The State further argues that *Moffett v. State*, 49 So. 3d 1073 (Miss. 2010), supports the trial court's exclusion of the evidence under Rule 403. But the State tries to stretch *Moffett*'s holding too far. *Moffett* did not hold that evidence of an alternative suspect based on criminal history is categorically inadmissible under Rule 403. In *Moffett*, the alleged third-party-guilt evidence was mere speculation that a third party—the defendant's stepfather—could have committed the capital murder with the underlying crime of sexual abuse of a child because the stepfather was allegedly a registered sex offender. *Id.* at 1095-96 (¶68). Moffett presented a much more attenuated connection between the crime and a third-party suspect; here, Butler had a proven connection to Lewis. Despite the State's suggestion, *Moffett* does not require that Marshall produce physical, forensic, or eyewitness evidence linking Butler to Lewis's murder.

¶42.    The trial court here found that the evidence was not relevant—a conclusion we reject.

14

The evidence Marshall offered was relevant to his defense that he did not commit the murder and that the police ignored evidence that Butler was the perpetrator.

¶43. The court also found that if the evidence were relevant, its probative value was substantially outweighed by the danger of misleading the jury and confusing the issues. *See* MRE 403. All evidence must pass through the "ultimate filter" of Rule 403 before it can be admitted. *Bufford v. State*, 191 So. 3d 755, 762 (¶32) (Miss. Ct. App. 2015). Because we find that the evidence was relevant, we must now determine whether the trial court erred in its alternative conclusion that the evidence needed to be excluded under Rule 403.

¶44. It is unclear why the trial court believed that Marshall's evidence would confuse or mislead the jury. When Marshall's counsel asked the court to reconsider its ruling, the trial judge remarked that it would be impossible to admit the evidence "without basically trying Mr. Butler's case in front of the jury." Marshall's counsel explained that he was not trying to get into the murder charge but to discuss only that Butler had a motive to have Lewis killed and that once Lewis was dead, Butler's indictment was dismissed.

¶45. The trial court abused its discretion by excluding the evidence under Rule 403. The trial court's conclusion that it would have to "basically try[]" Butler's murder case if he allowed in the evidence is without basis. Marshall's counsel was very clear about the questions he wanted to ask Officer McCain about law enforcement's failure to question Butler or entertain anyone other than Marshall as a suspect. Counsel briefly touched on that point in his closing argument, though the trial court's ruling on Butler's indictment prevented

further explanation. Marshall's counsel also clearly laid out his theories connecting Butler and Lewis and could have presented those theories without getting into the details of Butler's murder charge.

¶46.    Butler's indictment and the nolle prosequi order were relevant to Marshall's defense that Butler, not Marshall, wanted Lewis dead and committed the murder. The probative value of that evidence was not substantially outweighed by any reason under Rule 403, and the trial court abused its discretion by excluding it.

¶47.    Our analysis does not stop there. As noted, if the trial court's error did not prejudice the jury's verdict, the error was harmless, and we must affirm. *Cage*, 149 So. 3d at 1044 (¶13).

¶48.    The State argues evidence of Marshall's guilt was "overwhelming," pointing to Jackson's testimony that he saw Lewis getting into Marshall's car a few hours before his body was found; the shattered passenger window in Marshall's truck and glass found near Lewis's body; gunshot residue particles found on Marshall's hands; the guns turned in by Alexander matched a shell casing at the scene and a bullet recovered during the autopsy; and Parker-Shorter's testimony that Marshall confessed to killing Lewis in his truck.

¶49.    However, a close review of this evidence hardly supports the conclusion that the evidence against Marshall was "overwhelming." No blood was found in Marshall's truck or on the clothes. Although Burchfield testified that shooting a gun would expel many particles of gunshot residue, he testified that he found only two particles "indicative" of gunshot

residue on Marshall's hands and could not conclude that Marshall's swabs were "positive" for gunshot residue. Similarly, Burchfield could not conclude that the glass at the scene was the same as the glass from Marshall's truck; he could testify only that they were "consistent."

¶50. The strongest evidence in the State's favor was Parker-Shorter's testimony that Marshall said he had killed Lewis. Shorter-Parker testified that Marshall said he and Lewis were riding around and that Marshall "used the .380 first" and "ran out of bullets." Lewis then allegedly "jumped out of the car and was running," then fell. Marshall followed him in the truck and used the 9-millimeter gun to "finish it."

¶51. But Hathcock testified that he received the .380 gun with six bullets in the magazine—a full magazine for that gun. And the autopsy revealed no bullet entry wounds to Lewis's back. Moreover, no blood was found in the truck, conflicting with Shorter-Parker's claim that Marshall "emptied a .380" into Lewis.

¶52. Marshall's counsel pointed out most of these evidentiary discrepancies in his closing argument, which the jury clearly rejected. Had the jury heard those discrepancies alongside evidence that Butler benefitted significantly from Lewis's death, we cannot conclude beyond a reasonable doubt that the jury would have still found Marshall guilty of first-degree murder. Given this, we cannot conclude that the exclusion of Butler's evidence was harmless.

¶53. We therefore reverse Marshall's conviction and sentence and remand for a new trial.

¶54. **REVERSED AND REMANDED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER AND WEDDLE, JJ., CONCUR.**